*245
 
 ODOM, Justice.
 

 On February 20, 1931, John Laine, an employee of the defendant company, drove a gasoline tank delivery truck loaded with gasoline into the premises of the Checker Oab Company for the purpose of making a delivery of gasoline. While the gasoline was being emptied from the tank truck into the underground storage tank of the cab company through a hose, fire originated on the premises of the cab company near the place where defendant’s tank truck was parked and spread to the property of plaintiff and destroyed it. Plaintiff brought this suit against the defendant oil company to recover the value of the property destroyed, on the ground that the fire originated through the negligence and fault of the defendant and its employee, Laine, the driver of the truck, who is made a party defendant.
 

 Defendant denied in its answer that it was in any way responsible for the origin of the fire. There was judgment rejecting her demands, from which she prosecutes this appeal.
 

 , Plaintiff alleged and now contends that the fire was set off by an electric spark emitted where the hose nozzle entered the mouth or intake of the underground storage tank, which spark ignited the fumes from the gasoline, which in turn ignited gasoline spilled on the ground or pavement. It is alleged by the plaintiff that, when defendant’s tank truck reached the premises of the cab company where the gasoline was to be. delivered into the storage tank, it was charged with “static 'electricity,” which the experts refer to as electricity “at rest,” or an electrical current generated by friction between the gasoline and the tank. It is further alleged by plaintiff, and not disputed by defendant, that, when gasoline is transported in a tank truck for some distance, as it had been in this case, static electricity is generated, and that under ordinary atmospheric conditions accumulates and the truck becomes charged and remains so until it is
 
 grounded.
 
 It is plaintiff’s-theory that, when one end of the hose was attached to the defendant’s truck and the other end, which was equipped with a metal nozzle, was inserted into the mouth of the underground storage tank, there was an imperfect connection made between the nozzle and the storage tank, which caused the emission of a spark.
 

 Plaintiff alleges that the defendant was negligent; her major contention on that point being that defendant failed to equip its tank truck with -an approved safety device for relieving it of the electricity, which device is a metal drag chain, one end of which being attached to the truck and long enough so that the other end will drag on the ground, thereby grounding the truck and allowing the electricity to “bleed off” as fast as generated.
 

 Defendant admits that its truck was not so equipped, but it denies that the truck was charged with electricity at the time plaintiff claims that the spark was emitted at the end of the hose nozzle, and says therefore that there could have been no spark. Defendant does not' dispute the contention of plaintiff that electricity is generated by the carrying of gasoline in a tank truck. It concedes that there was probably some electricity generated oh this occasion. But it contends that none accumulated or remained in the truck, for the reason that this was a damp, misty morning, the humidity being 95 per cent.; that under such conditions moisture accumulated on the metal parts of the truck which caused the
 
 *247
 
 electricity to escape or be dissipated. It is further contended that, conceding there was an accumulation of electricity in the truck when it reached the premises, it escaped when the driver stepped from the truck to the ground; its theory being that, at the moment when the driver had one foot on the ground and the other on the metal running board of the truck, the circuit between the truck and the ground was complete, the human body being a conductor of electricity; in other words, that by this process the truck was momentarily grounded and that only a moment was necessary in order to permit the entire charge, if any, to escape.
 

 It is shown by the testimony that not only did the driver of the truck step from the running board to the ground, but that an employee of the cab company stepped from the ground to the running board and thence upon the tank, and later stepped from the running board back to the ground.
 

 The testimony shows that the gasoline was emptied from the tank truck into the underground storage tank of the cab company through a hose lined with a flexible metallic substance which was a conductor of electricity. One end of this hose was attached to the tank truck by means of a metallic coupling or cuff. At the other end of the hose there was a metallic nozzle. It is contended by defendant that, when the nozzle of this hose was inserted into the mouth or intake of the underground storage tank, the truck was perfectly grounded, and that, if there had been an accumulation of electricity in the truck, it would have been dissipated the moment the connection was made. The testimony shows that at the "time the fire originated there 'had been drawn from defendant’s tank truck several hundred gallons of gasoline, the process consuming some fifteen or twenty minutes.
 

 Considering now the testimony of the experts, we think it clearly shows that, when gasoline is carried in metal tanks, the friction between the gasoline and the inside walls of the tank caused by the “sloshing” of the gasoline produces what is called “static electricity” which permeates the parts of the truck and causes it to be “charged.” But they are agreed that whether the truck remains so charged depends largely upon atmospheric conditions; that, if the atmosphere is dry, the electricity remains in the truck; but, if it is so highly impregnated with moisture that water accumulates ■ on the metal parts of the truck, the electricity is “dissipated” or escapes.
 

 The testimony shows that on this occasion the humidity was 95 per cent., or only 5 per cent, less than rain. So it is probable at least that whatever electricity was generated by the movement of the truck on this occasion was dissipated as fast as it was generated and that there was no accumulation. Dr. Ricker, one of the plaintiff’s experts, said, “I should not expect that a truck traveling through the streets under those conditions would have any charge that you could measure with any means, accumulate upon it.”
 

 The testimony of the experts leaves us in no doubt that it is not only possible but highly probable that, if the truck had been charged with electricity when it reached the premises, that charge was instantly discharged when the driver stepped from the running board to the ground or when the employee of the Checker Cab Company stepped from the
 
 *249
 
 ground to the running board and then back to the ground. The human body being a conductor of electricity, the circuit between the truck and the ground was complete and the truck was grounded at the moment one foot was on the ground and the other on the running board, and the experts agree that, if the truck was grounded by this or any other means, the entire charge was instantly discharged.
 

 Again, we think their testimony makes it reasonably certain that the truck was grounded by the hose and its parts. The hose itself was lined with a flexible metallic substance. It was equipped at one end with a metal sleeve or cuff by which it was screwed to the tank truck. At the other end there was a metal nozzle attached by a metal coupling. This nozzle was inserted into and rested against the metal mouth or intake of the underground storage tank. This situation remained for some fifteen or twenty minutes while something like 400 gallons of gasoline were being emptied from the truck into the storage tank.
 

 It may be imagined, but under the testimony it cannot be held, that there was a break in the metal lining of the hose or that there was an imperfect connection between the hose and the metal sleeve or cuff at the end attached to the truck or a bad connection where the nozzle joined the hose. If there were no such breaks, the truck was perfectly grounded at least fifteen minutes before the alleged spark was emitted.
 

 The probability or possibility that there were such breaks in this connection is suggested by counsel for plaintiff in order to controvert defendant’s theory that the truck was not charged at the moment the alleged spark was emitted. But this suggestion is destructive of plaintiff’s theory, propounded in the petition and argued here, that the fire was set off by a spark emitted at the mouth or intake of the storage tank due to an imperfect connection there. If as alleged and argued there was a spark at that point, necessarily the electricity had to reach that point through the very instrumentality which it is suggested' was probably imperfect.
 

 Plaintiff alleged and contends that a spark was emitted at the intake of the storage tank due to a bad connection there. It is reasonable to conclude that, if there had been an imperfect connection there, and if the truck had been charged when it was connected to the storage tank by the hose and its parts, the spark would have been emitted the moment the nozzle touched the metal intake.
 

 But such connection as there was remained during the entire period of emptying one compartment of the truck tank which contained more than 300 gallons. The truck tank was composed of three compartments. One was emptied and the hose was detached from it and attached to another. It may be that the shifting of the hose jarred the nozzle so as to make an imperfect connection, or, as counsel suggest, the hose may have been disturbed otherwise. Even so, there must have been a perfect connection at first, otherwise there would have been a spark there had the truck been charged. If there was ever a perfect connection or grounding of the truck, the entire charge was momentarily discharged.
 

 Therefore if it be conceded, as plaintiff contends, that the truck was charged with electricity when it reached the premises of the cab company, the testimony of the electricians
 
 *251
 
 who were sworn as experts makes it clear that this charge could easily have been discharged before the fire occurred. It cannot therefore be held as a fact that at the time the fire originated defendant’s truck was charged with static electricity. In fact, we are convinced that it was not.
 

 This brings us to a consideration of the theory that electricity may have been generated by the flow of the gasoline through the hose and that a “charge” may have accumulated in this way. Th-is theory was advanced and apparently sustained in the case of Standard Oil Co. v. Pitcher (C. C. A.) 289 F. 678, 682, cited by plaintiff’s counsel and to which we shall refer later. The experts committed themselves to this theory. They say that electricity can be generated in that way, and we accept without question their testimony that it can. But we have reason to doubt that a sufficient amount to create a spark was so generated in this case. The experts say that the question whether electricity is generated and the quantity depends upon the velocity of the flow through the hose. It seems that, if there is slight pressure and the gasoline pro<ceeds slowly, the friction is not sufficient to generate electricity in any quantity. It was estimated that the velocity in this instance was 28 feet per minute. Mr. I-Iuey, an expert called by plaintiff, said he had no idea as to what the velocity would have to be in order to generate electricity. Mr. Bicker, another expert, was not questioned on this particular point. Mr. Todd, an expert called by defendant, said:
 

 “I have not been able to find any definite data as to the necessary velocity to create a statical effect due to this flow, but I believe that it is attained mostly under pump pressure conditions and that velocities of 100 feet or better would be necessary.”
 

 He explained that he meant 100 feet per minute. He said also:
 

 “I have made a test of gasoline flowing through a hose under similar conditions, and the gasoline in the hose attained a velocity of approximately 27 feet per minute.”
 

 He further testified that in his opinion a velocity as low as 27 feet would not generate electricity in sufficient quantities to cause a spark. In the case of Standard Oil Co. v. Pitcher, supra, the court stated, without stressing the fact, that the gasoline was flowing through the pipe “under pressure.”
 

 In view of the testimony of these experts, we must discard the theory that there was sufficient electricity generated in this way to cause a spark.
 

 On the whole, plaintiff has failed to show with any degree of certainty that the fire was set off by a spark. To hold that it was would be to indulge in pure speculation. It is barely possible that it was started in this way. But it is not at all probable.
 

 But, conceding that it was, we think it reasonable to hold that, unless it is shown that the fire originated at the end of the nozzle or at the intake or mouth of the underground tank, it has failed to make out its case, because it is alleged and contended all through that the fire was set off by a spark emitted at that point. The electricians testified that it is not probable that a spark was emitted from any other point.
 

 The testimony makes it perfectly clear that the fire did not originate at the place al
 
 *253
 
 leged. The intake of the storage tank is on the inside of an inclosure used by the manager of the Checker Oab Company as an office. This was inclosed by a solid wall about four feet high and by screen wire from this wall to the ceiling. The nozzle of the hose was put through an opening in the door, or, as one witness said, “through a crack in the gate,” and then inserted into the intake pipe. Mr. Hayden was on the inside of this office within three feet of the intake at the time the fire originated, and he is positive that the fire started outside near the pump used by the cab drivers to fill the tanks of their cars. Mr. Hayden was in a position to know whether the fire originated inside this small office. He is positive that it did not. He was asked, “When did you first see the fire?” and he said, “In front of the gasoline tank where the cabs guage up; this little pump that pumps gasoline out of the big tank.” He said this was about eight or ten feet from the intake pipe of the underground tank.
 

 The witness Biggio testified that, while he did not see the fire when it started, yet he first saw the blaze at or near the filling tank mentioned by Mr. Hayden as being on the outside of the office above referred to. He said, in answer to a question by the court as to where the fire started, “Well, the fire started right there where we load cars with gasoline— c-abs.” Mr. Ponthier was asked where the flames were when he first saw them and said, “Right where the cab guages, right in front of the office.” A colored man named McClinton, who was some distance away, testified that when he first saw the fire it was outside 'of the office. The testimony of all these witnesses except Mr. Hayden is criticized and discredited by counsel for plaintiff because they had previously stated, and in fact admit-' ted while on the stand, that they did not see the fire when it first broke out. But we think their testimony in connection with that of Mr. Hayden makes it clear that the fire did not originate inside of the office.
 

 Counsel for plaintiff say in their brief at page 6:
 

 “Tire record shows affirmatively that there was no other cause of the fire except those directly chargeable to defendant’s negligence in not having a safety chain that day.”
 

 The record does not support the contention that the cause of the fire is traceable to defendant’s negligence. It is true that it was not shown just how the fire originated. If it be conceded that defendant was negligent in failing to equip its truck with a drag chain, that alone is not sufficient to condemn it in this proceeding, in the absence of a reasonable showing that such negligence was the cause of the fire, and we find that such was not shown.
 

 The defendant not having shown that the fire originated from some other cause, plaintiff’s counsel contend that its origin must necessarily be attributed to the cause which it suggests, and they invoke the doctrine of res ipsa loquitur.
 

 Under the general heading “Negligence” the doctrine res ipsa loquitur as applied to negligence cases is explained in Ruling Case Law, vol. 20. p. 187, as follows:
 

 “More precisely the doctrine res ipsa loquitur asserts that whenever a thing which produced an injury is shown to have been under the control and management of the de
 
 *255
 
 fendant, and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of injury itself will be deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care.”
 

 Res ipsa loquitur is a phrase meaning “the thing speaks for itself,” “the affair speaks for itself,” or “a general way of saying that the circumstances attendant upon an accident are of themselves of such a character as to justify a jury in inferring negligence as the cause of the accident.” 34 Cyc. 1665; 45 C. J. 1193-1196; 7 Words and Phrases, First Series, 6136. This doctrine has no application here.
 

 Oounsel'for plaintiff cite the following Louisiana cases in support of their contention: Prescott v. Contracting Co., 162 La. 885, 111 So. 269, 270; Montgomery v. Gulf Refining Co., 168 La. 73, 121 So. 578, 579; Motor Sales
 
 &
 
 Service v. Chemical Co., 15 La. App. 353, 131 So. 623; and Horrell v. Cotton Oil Co., 15 La. App. 603, 131 So. 709 — the latter two being decisions of the Court of Appeal.
 

 In the Prescott Case, plaintiff sued defendant for the value of a house alleged to have been burned through the fault and negligence of defendant. The court found as a fact that “the house was set on fire by sparks which were emitted from the smokestack of the boiler that defendants were, at the time, operating in connection with their hoisting engine.” In the Motor Sales Company Case the bung fell out of a drum of sulphuric acid while
 
 being
 
 transported on the streets. Acid escaped and injured the property of another. In the Horrell Case a young man 24 years old died as a result of bums sustained while doing'certain repair work in the manufacturing plant of the defendant. In these cases the cause of the injury was not disputed. The only question for determination was whether there was negligence in the use of the instrumentalities. The cases are not in point here for the reason that it is not shown that the thing or instrumentality used by defendant caused the fire.
 

 In the case of Montgomery v. Gulf Refining Co., defendant was delivering gasoline to a filling station and intrusted the handling of the hose to a child 12 or 14 years old, who lighted a match which caused the explosion. The question presented was whether the intrusting of a dangerous instrumentality into the hands of a child was negligence on the part of defendant, and the court held that it was. There are certain other cases c-ited, but in each of them it was conceded that the machinery or instrumentality owned and under control of the defendant did in fact cause the injury.
 

 Plaintiff cites also the case of Standard Oil Co. v. Pitcher (C. C. A.) 289 F. 678, whiph case is similar in some respects to this one. The defendant was operating a filling station and automobile delivery trucks, and, while one of its trucks was being loaded, fire originated at the tank of the truck. The defendant owned and controlled both the filling station and the truck. It was contended that the flow of the gasoline through the filling pipe generated static electricity which charged the truck. The case was submitted to a jury which found for plaintiff, and the appellate court found that there was evidence from which the jury could find that frictional or static electricity could bé generated by the forcing of the gaso
 
 *257
 
 line under pressure through an iron pipo, that the automobile tank was not grounded, and that the vibration of the filler pipe and the sleeve would produce a break in the electrical connection between the manhole of the tank and the pipe or sleeve and produce an electric spark.
 

 It was further held that it was not necessary that plaintiff show that a static spark was actually produced, but it was sufficient if conditions and circumstances were shown from which the inference could be reasonably drawn that a static spark was produced, and held further that there was sufficient evidence, if believed by the jury, to support the verdict.
 

 One difference between that case and the one at bar is that here the conditions and circumstances shown are not such as to warrant a reasonable inference that a static spark was produced at the place where it is claimed the fire originated. Another is that in that case, the defendant owned and controlled both the filling station and the truck and was responsible for the damage caused by fire of unexplained origin on its premises. Here the defendant did not own or control the premises where the fire originated, but owned and controlled only the truck and its parts.
 

 Lastly, plaintiff charges that defendant’s employee, Laine, was negligent in leaving the truck tank unattended while the gasoline was flowing and in blocking the valve open instead of holding it open. The point is that, if Laine had been holding the valve open when the fire broke out, he would have closed it instantly and thereby prevented the accumulation of gasoline on the floor when the hose nozzle was pulled from the underground tank; it being contended that, but for the spilled gasoline, the fire would not have spread to plaintiff’s property.
 

 There is
 
 testimony in
 
 the
 
 record to
 
 the effect that the purpose of the automatic valve is to shut off the flow immediately in case of emergency. There is also testimony that Laine handled the valve in the usual and customary way. We think it was negligence to leave the valve propped open and unattended. But, in the absence of a reasonable showing that such negligence was at least a contributing factor leading to plaintiff’s loss, there can be no recovery. The testimony is indefinite as to the amount of gasoline which escaped through the hose after the fire was set off. Biggio testified that he disconnected the lever which held the faucet open immediately after the fire started. He did not know, nor did any one else, how much was wasted, although some was. Apparently there was not a great deal, because one compartment in the truck was full and another about one-third full after the fire. This, checked with the amount which was emptied into the underground tank before the fire, accounts for practically all that was originally contained in the three compartments.
 

 The fire started at or very near the pump used by the cab drivers to ‘‘guage up” or to fill the tanks of their cars before starting out on a trip. Although the testimony is not clear on this point, there must have been some waste gasoline or grease on the ground or floor at the pump, because there is where the fire started, and, if it be conceded, as plaintiff says, that the fire was set off by a spark which ignited the fumes at the mouth of the storage tank, which in turn ignited the gasoline, there
 
 *259
 
 must have been some there when the spark was emitted, because it was only after the fire started that any gasoline from defendant’s truck was spilled.
 

 In addition to this, it is clear that there was attached to the filling pump a- glass container holding ten gallons of gasoline. This was full and spilled when the container burst. Whether this amount of gasoline was sufficient to cause the fire to spread to plaintiffs property it is impossible to say.
 

 There is no way of determining that it would or would not have spread to her property but for the additional amount spilled from defendant’s tank.
 

 Finding as we do that the testimony does not warrant the holding that defendant was responsible for the origin of the fire, we must approve the finding of the trial court and reject plaintiff’s demands.
 

 Judgment affirmed.
 

 ST. PAUL, J., absent.