## CLAWSON v. WALGREEN DRUG CO. et al.

*No. 6824. Decided October 23, 1945. (162 P. 2d 759.)*

See 5 C. J. S., Appeal and Error, sec. 1763, liability for injuries to pedestrians from doors or gates, note, 77 A. L. R., 1116. See, also, 25 Am. Jur., 767.

*Howell, Stine & Olmstead,* of Ogden, for appellant.

*Thatcher & Young,* of Ogden, for respondent.

WADE, Justice.

Tort action to recover damages for personal injuries incurred when the plaintiff fell after colliding with an open sidewalk door maintained and used by the defendant. The jury returned a verdict in favor of the plaintiff and the defendant appealed.

The defendant, Walgreen Drug Company, a corporation, operates a drugstore in Ogden, Utah. The store is located on the northwest corner of the intersection of Twenty-Fifth Street (running east and west) and Washington Avenue (running north and south). In connection with the operation of this drugstore, the defendant maintains and uses an opening in the sidewalk on Twenty-Fifth Street for the purpose of receiving merchandise into the store basement. This opening is covered by a double iron trap door which locks on the under side and opens upward from the sidewalk. When fully opened the doors stand about two feet

high and block the entrance to the opening when it is approached either from the east or west. The opening is against the building on the north and the south end is unguarded when the doors are opened.

On the morning of August 10, 1943, the sidewalk doors were open and unattended. The plaintiff approached the opening. On direct examination the plaintiff testified that he stepped aside to let a woman pass and stepped into the hole. On cross-examination he admitted that he had told his doctor that he bumped into one door and fell against the other one. He also stated that he might have bumped into the door and knocked it down. He was positive that he did not fall down into the hole but stopped at the lid on the other side. One Rufus Southam was called to testify for the plaintiff. On direct examination he stated that the plaintiff came down the street and

"run smack into them doors, * * * ran into them and went right over the top." "He hit the east door first and knocked that down and hit the other door."

Plaintiff testified that he had faulty vision and that the opening was in the shadow of an awning used by the defendant to shade the store windows.

By way of numerous assignments of error the defendant contends: (1) That as a matter of law there is no showing that the defendant was guilty of negligence which proximately caused the injuries to the plaintiff; (2) that the plaintiff was guilty of contributory negligence as a matter of law; (3) that the court erroneously permitted the plaintiff to plead and introduce in evidence a certain city ordinance relating to the repair of sidewalk doors and erroneously submitted the said ordinance to the jury as a measure of the defendant's duty to the plaintiff; (4) that the court erred in various respects in its rulings on admissibility of evidence; and (5) that the court erred in various particulars in its instructions. Contentions Nos. (1) and (3) are interrelated and can best be discussed together.

The ordinance was not limited to requiring that the cellar doors or coverings be kept in good repair but it also required that such doors and coverings be kept safe for the passage of the customary traffic. The Ordinance provides:

"Trap doors and openings in sidewalks regulated. *It shall be unlawful for the* owner or *occupant of any building having a cellar opening upon any* street or *sidewalk to fail to keep the door* or other covering *thereon* in good repair and *safe for the passage of the customary traffic on such* street or *sidewalk* and if the owner or occupant of any such building shall neglect or refuse to properly repair any such door or covering for twenty-four hours after notice so to do, the Street Supervisor or the Chief of Police shall forthwith cause such repairs to be made at the expense of the owner or occupant." (Italics added.)

In the above quotation we have italicized only those portions thereof that have a bearing on this case. This ordinance means as far as this case is concerned just what it would have meant had the parts not italicized been omitted in which case it would have been a clear provision that occupants of buildings having an opening on the sidewalk must keep the door thereof in a safe condition for the customary traffic thereon. The ordinance uses the words "in good repair *and* safe," not "in good repair *so that it will be* safe," which indicates an intention to require not only that the doors be kept in good repair but in a safe condition at all times, whether open or closed, for customary traffic. If this were not so, one who was injured because the doors were not kept in good repair could recover, whereas another was injured by doors which were in good repair but which had not been properly closed so that one door projected about one-half inch above the other, could not recover. It is true that the rest of the ordinance emphasizes the keeping of the doors in good repair but that does not take therefrom the positive requirement that it also be kept safe.

The court by its instructions to the jury so construed the ordinance. In substance they were told that if they found that defendant violated the ordinance "by failing to main-

tain the opening reasonably safe for the passage of the customary traffic on the sidewalk" they should find him guilty of negligence. Under this instruction the jury could only find the defendant negligent on the ground that he did not keep the door of the opening reasonably safe for the passage of the customary traffic on the sidewalk by leaving the door open, unattended and unguarded. This instruction would have been correct under the common law theory of negligence, even if there had been no ordinance.

Any negligence which is disclosed by the evidence must lie in the fact that the defendant left the doors open while not in use. Witness Southam testified that the doors were open when he passed them about 10:30 a. m.; that he went across the road and sat down on a bench and had been sitting there for about 15 minutes when he saw the plaintiff approaching the area of the sidewalk door. He testified that there were no attendants around the door and that it was not being used in connection with the unloading of any vehicles. This evidence is uncontradicted. It is admitted that the opening through the sidewalk was unguarded except as the open doors obstructed the approach from either the east or west. We can therefore accept as established facts that the doors stood open for at least 15 minutes, unattended and unguarded except by the doors themselves, and that the opening was not during that time in use by the defendant.

In the use of the sidewalk door the defendant had a duty to use the doors with reasonable care so as to not subject others to unreasonable risks of harm. As compensation for the privilege of maintaining a door through the public sidewalk, the defendant had the duty of safe-guarding the opening so as fairly to protect the public in its ordinary use of the street. This public street was open alike to the weak, the lame, the halt and the blind and those, as the plaintiff, suffering from impaired eyesight. The presence of persons with impaired eyesight was reasonably foreseeable. A fall into the opening threatened serious bodily harm. These factors should be taken into account in determining whether or not the defendant exercised the re-

quisite degree of care. The conduct of the defendant at least presented a jury question on the issue of negligence. Such appears to be the uniform holding of the various authorities. See collection of cases in 70 A. L. R. commencing on page 1358. Whether the open doors themselves furnished a sufficient guard was also a jury question. *Bosler Hotel Co.* v. *Speed,* 167 Ky. 800, 181 S. W. 645. The court therefore did not err in giving such instruction.

In contending that the plaintiff was guilty of contributory negligence as a matter of law, the defendant assumes that the law imposed the duty upon the plaintiff to keep his eyes constantly upon the sidewalk in anticipation of open sidewalk doors. Such, however, is not the law. As noted by the annotator in 70 A. L. R. 1358, the traveler on public sidewalk must exercise reasonable care for his own safety,

"but this does not necessarily mean that a pedestrian is required to be constantly watching for openings in the sidewalk. The pedestrian has the right to assume that the sidewalk is in reasonably safe condition for travel, and to act on that assumption." See also Shearman and Redfield on Negligence, Vol. II, p. 922.

The plaintiff, though under disability, was not necessarily required to exercise such a degree of care as to overcome the effects of the disability. The correct rule is that he must use reasonable or ordinary care for his own safety. In determining what is ordinary care the jury should take into account the physical disability. The care required of a person with defective eyesight is that care which an ordinarily prudent person with defective eyesight would use for his own safety under all the circumstances. *Smith* v. *Sneller,* 345 Pa. 68, 26 A. 2d 452, 141 A. L. R. 721, 724, and cases collected therein.

The uncontradicted evidence shows that the opening was in the shadow of an awning maintained by the defendant to shade the store windows; that the plaintiff had impaired eyesight, but that he could have seen the trap door if he "had looked right down." Whether he used

the requisite degree of care for his own safety was a jury question. See the collection of cases in *Olson* v. *City of Butte*, 86 Mont. 240, 283 P. 222, 70 A. L. R. 1358, 1388.

The assignments of error relating to the court's rulings on the admissibility of evidence primarily involve the exclusion of the testimony of two doctors. The plaintiff had objected to testimony on the grounds that it was privileged under Section 104-49-3 (4), U. C. A. 1943, which provides:

"A physician or surgeon cannot, without the consent of his patient, be examined, in a civil action, as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient.

One of the doctors, Dr. Dumke, attended the plaintiff when he was first taken to the hospital. The other doctor, Dr. West, took various X-ray pictures of plaintiff's back and skull. These pictures were taken at the request of Dr. Dumke in the treatment of the plaintiff. The defendant attempted to prove by these two doctors that the X-ray pictures did not show any injury to the bones in plaintiff's back, but disclosed a pronounced arthritic condition which could have developed as a result of this injury. Upon objection of the plaintiff, the proffered proof was rejected. It is not contended by the defendant that Section 104-49-3 (4) did not apply. Rather the contention is that the plaintiff, by testifying himself concerning the nature and extent of his injuries, waived his privilege.

We have consistently held that the privilege given by Section 104-49-3 (4) is personal to the patient and can be waived. *Dahlquist* v. *Denver & R. G. R. Co.*, 52 Utah 438, 174 P. 833; *Moutzoukos* v. *Mutual Benefit Health & Accident Ass'n*, 69 Utah 309, 254 P. 1005. In contending that the plaintiff did waive his privilege the defendant relies primarily on the *Dahlquist case*, supra. In that case, on the question of whether or not the patient had waived his privilege under Section 104-49-3 (4) the court was divided three to two. The two dissenting justices were of the opinion that the privilege was not waived. Each of the three prevailing justices wrote an opinion. Two of

the prevailing justices, McCarty, J. and Thurman, J., agreed that the patient could testify generally concerning his physical condition, describe the nature and extent of his injuries as he saw and felt them so long as he did not refer to what the doctor may have told him or did for him concerning his injuries. Thurman, J., went further and stated that there was no waiver by the patient in the calling of another doctor to testify concerning the details of his injuries. On petition for rehearing the three prevailing justices stated [52 Utah 438, 174 P. 846]:

"If there are shades of differences in the reasons assigned for the reversal of the judgment in the opinions heretofore handed down, it is sufficient to say, as before stated, we all agree that where a party voluntarily, in a trial of his own cause, states what his physician did and said respecting the injuries which are the subject of litigation, he should not be permitted to close the mouth of the physician when offered as a witness by his adversary solely on the ground of privilege."

, This quotation gives the full extent of the holding: a patient cannot testify concerning what was said and done by his physician in the treatment of the injuries which are the subject of the litigation and then close the physician's mouth by claiming privilege. This doctrine was reaffirmed by a unanimous court in *Moutzoukos* v. *Mutual Ben. Health & Acc. Ass'n,* 69 Utah 309, 254 P. 1005.

Neither of these cases is in point in the instant case. The plaintiff here did not testify concerning anything which either Dr. Dumke or Dr. West told him nor did he give details concerning the mode of treatment. The plaintiff did not by his own testimony waive the privilege. Nor did the use of Dr. Kerr as a witness for the plaintiff constitute a waiver. Dr. Kerr was subject to cross-examination by the defendant. The X-ray pictures which he testified that he took and which he identified for the court were admitted in evidence. Dr. Dumke and Dr. West were both permitted to see these pictures and to testify in full as to what the pictures diclosed. There was no error in this regard.

The only other assignment of error relating to rulings on the admissibility or exclusion of evidence which we deem it necessary to note relates to the overruling of an objection by the defendant to a question calculated to elicit evidence of loss of earnings. It is objected that loss of time should have been specifically pleaded before evidence on it was admissible. This assignment involves the same basic problem as that raised by the assignment that the court improperly permitted the jury to consider "loss of time" and "impairment of earning capacity" as elements of damage. The assignments may be discussed together. At the outset it should be noted that a distinction is made between loss of earnings and impairment of earning capacity. The former relates to the loss of wages which might have been earned had the plaintiff not been injured. The latter relates to the diminution of earning capacity. The measure of damages for the former may in general terms be stated as the amount the injured person might reasonably have earned in pursuit of his ordinary occupation. The measure of damages for the latter in general terms is the difference between the amount which plaintiff was capable of earning before his injury and that which he was capable of earning thereafter. See in general 25 C. J. S., Damages, §§ 38, 40, 86, 87, 136 and 137. Some jurisdictions hold that before recovery can be had for loss of wages the loss must be specifically pleaded. *Hoffmann* v. *Lane,* 11 Cal. App. 2d .655, 54 P. 2d 477; *Northern Ind. Public Service Co.* v. *Robinson,* 106 Ind. App. 210, 18 N. E. 2d 933. The same holding has been applied to claims for damage for impairment of earning capacity. See 25 C. J. S., Damages, § 137.

In *Littledike* v. *Wood,* 69 Utah 323, 255 P. 172, 173, while apparently recognizing that these items constitute special damages, we held that 

"If loss of time or of earnings or impairment of earning capacity naturally and necessarily results from the injuries which are described and of the act complained of, evidence can be given of such loss without specially pleading it. *Atwood* v. *Utah Light & R. Co.,* 44 Utah 366, 140 P. 137."

In the instant case the plaintiff did plead that he would

"forever * * * be prevented from attending to and transacting his business or from performing any labor for the remainder of his lifetime to his damage in the sum of Twenty Thousand Dollars * * *."

It is also alleged that the plaintiff was confined to the hospital and incurred an obligation amounting to over $600 for services rendered by the hospital. Under the holding of the Littledike case, supra, this is a sufficient allegation, when taken with the allegations concerning the nature of his injuries, to warrant the introduction of evidence relative to impairment of earning capacity. In the absence of special demurrer it is also probably sufficient to permit evidence as to loss of earnings although it would have been better if specifically pleaded.

Plaintiff's testimony regarding loss of earnings was merely that he made "pretty good" while trapping and farming and that he made enough money "to spend and run around with and help the folks out." Plaintiff also testified that he was able, before the injury, to work as a trapper and farmer and that after the injury he could not do such work. Since impairment of earning capacity involves the capacity of the injured person rather than merely what he might have made following his ordinary pursuit, it was not error to permit the jury to consider impairment of earning capacity as an element of damage. This is so although it was not shown with any degree of certainty what plaintiff's earning capacity had been in the past. The focal point of the inquiry is not what plaintiff actually would have earned, but the difference in his capacity to earn—before and after the injury. As to loss of time as an element of damages the evidence was so uncertain as to make it impossible for the jury to fix that item of damage with any degree of certainty. There is no evidence as to what the value of plaintiff's lost time was up to the time of the suit and in view of the fact that there

was no evidence or claim by the plaintiff for loss of time, it was error to instruct the jury that it might consider loss of time as an element of damage. However, the possibilty is very remote that the jury did take into consideration the value of plaintiff's loss of time in computing the damages, or took into consideration more than his general impaired earning capacity. This it could properly do. This error, therefore, was not prejudicial.

One other instruction should be noted: In defining the defendant's duty the jury was told that defendant was required to make the opening in the sidewalk reasonably safe for customary traffic on the public street and that if the jury found that by reason of the absence of any fence or barrier or other protection on the south side of the trap door the sidewalk was not reasonably safe, it could find the defendant guilty of negligence. As already noted there is no evidence that the failure to have a fence or barrier on the south side of the door in any way contributed to the injury. The plaintiff, according to his own testimony, did not fall into the hole. He bumped into one door and apparently knocked it closed and fell upon the edge of the other door. Witness Southam also so testified. The failure to have a barrier on the south side could have made no difference. The court therefore erred in giving such instruction, but in view of the conclusiveness of the evidence that plaintiff fell over the door and did not step into the hole from the south between the doors, the jury could not have been misled by this instruction, and therefore the error was not prejudicial.

The judgment is affirmed. Costs to respondent.

McDONOUGH and TURNER, JJ., concur.

WOLFE, Justice (concurring in part, dissenting in part).

I agree that whether the defendant performed its duty to the plaintiff, in leaving the doors open and unguarded, was for the jury. The more doubtful question is whether such negligence was the proximate cause of plaintiff's mis-

hap. The only way one can use the vault when the doors are not down is to keep them open. In this case the plaintiff did not fall into the hole but walked into and onto the door. If he walked into a door over two feet high, might he not have walked into any other guard placed before the door or as easily failed to see any flag or warning sign? And if so, the only other conceivable way to guard him from walking into the door would have been to have a human attendant there to warn him. But in view of the location of the opening and the poor vision of the plaintiff, I agree that whether the defendant performed its duty to him in this case is a question for the jury.

I cannot agree that the ordinance pleaded, introduced and in regard to which the court instructed, pertained to a duty to keep the vault, when open, safe for pedestrians. The ordinance which was pleaded by the plaintiff and admitted in evidence by the trial court is as follows:

"Trap doors and openings in sidewalks regulated. It shall be unlawful for the owner or occupant of any building having a cellar opening upon any street or sidewalk to fail to keep the door or other covering thereon in good repair and safe for the passage of the customary traffic on such street or sidewalk; and if the owner or occupant of any such buiding shall neglect or refuse to properly repair any such door or covering for twenty-four hours after notice so to do, the Street Supervisor or the Chief of Police shall forthwith cause such repairs to be made at the expense of the owner or occupant."

The ordinance makes it unlawful to *fail* to keep the *doors* or *other covering* in good repair and safe for passage. The doors or other covering is the subject of legislation. The failure which is denounced is not keeping open the vault unguarded or unattended, but failure to keep the doors or other covering thereon in good repair and safe for passage in its function as a covering. It is admitted that if the doors are closed but one or both allowed to protude the doors or coverings are not then kept safe as a footing for passage. That is a common sense construction. But what is here meant to be said is that the ordinance does not deal with a situation where the doors are upright and open

which then leaves the vault and not the footway as a dangerous condition. The one exposes a pedestrian to stumbling or tripping; the other to a fall into a vault. Certainly it is straining language to the utmost to read it as if it was worded

"It shall be unlawful for the owner or occupant of any building having a cellar opening upon any street or sidewalk to fail to keep the door or other covering thereon in good repair and *if the doors are opened the sidewalk* safe for the passage of customary traffic," etc. (matter in italics inserted).

At a glance it can be seen that the italicized words import an idea not meant to be included in the subject of the legislation. The legislation required vault doors or coverings to be kept in repair and doors or coverings to be kept safe. The whole ordinance deals with doors or coverings when used as sidewalk. It cannot mean that if the owner shall fail to keep the *opening* safe or the sidewalk safe from bumping against open doors that the Street Supervisor or Chief of Police shall cause that condition to be remedied because it says "shall forthwith cause *such repairs* to be made at the expense of the owner or occupant," etc. So, I cannot agree on the construction given to this ordinance in the main opinion. The opinion does not construe, it adds to an ordinance and makes the real ordinance include something which it is deemed desirable that it should include. If it were not for my desire to keep court functions within their proper sphere, I would not think it important enough to spend this time in analyzing the ordinance for I admit without it there is a common law duty toward pedestrians to protect them from the unreasonable risks of open vaults. The trouble in this case was that the court used the ordinance as a basis for an instruction.

Defendant's motion to strike the allegations relating to this ordinance was denied. The ordinance was admitted in evidence over defendant's objection; and the jury was instructed that if it found that defendant violated the provisions of this ordinance and that such violation was the

proximate cause of plaintiff's injuries, the verdict should be for the plaintiff. Each of the above rulings by the court constituted error. The ordinance did not purport to require the users of sidewalk doors to keep them closed when not in use. Rather, it related to the duty to keep the doors in good repair.

In construing this ordinance a distinction should be made between it and such as was under construction in *Moore* v. *Miles,* 108 Utah 167, 158 P. 2d 676, and *Olsen* v. *Hayden Holding Co.,* 92 Utah 551, 70 P. 2d 463. There the ordinance required hotels to install a proper lighting system. We held that this also imposed the duty of keeping that system properly lighted. The rationale of such a holding is that the ordinance requiring installation of a proper lighting system could have been passed only for the purpose of assuring proper lighting. To have an excellent system of lights installed but not lighted would be of no avail in accomplishing the objective of the ordinance. Such is not the case here. The ordinance requiring proper repair was not enacted for the purpose of making certain the doors will be closed while not in use or to protect pedestrians from the open vault when in use or not in use. It was designed to protect the public against doors which, though closed, were dangerous in that they might cave in or cause a pedestrian to trip or fall. The relationship between keeping the doors in repair and keeping them closed is, therefore, not like requiring a proper lighting system and keeping it lighted. The ordinance simply provides that the owner or occupant of any building having a trap door must keep it in repair, and if he does not do so the named city officials would do so at his expense. It is unreasonable to construe it as though it were designed to assure that trap doors would be closed while not in use.

The court's opinion, therefore, holds that the instruction was proper because it construes the ordinance as applicable to the situation of open doors. I do not. I think the ordinance inapplicable and the instruction therefore not applicable and erroneous. Whether the error was prejudicial is another

matter. Minds could differ as to whether it tended to confuse the jury. No attempt was made to construe the ordinance for the jury. It was merely read to the jury and the jury was told that it could find the defendant negligent if it found that he violated the ordinance. There, of course, was no evidence that the door was out of repair or that disrepair was in any way a proximate cause of the injury. The instruction thus covered, in my way of thinking, a matter (failure to keep the doors in repair) upon which there was no evidence.

I note a change in policy of this court in regard to determining whether inapplicable instructions are prejudicial. In earlier days, this court held that an inapplicable instruction would be presumed to be prejudicial unless it clearly appeared that it could not have been so. *Davis* v. *Midvale City*, 56 Utah 1, 189 P. 74; *Smith* v. *Canady*, 45 Utah 521, 147 P. 210; *Everts* v. *Worrell*, 58 Utah 238, 197 P. 1043; *Shields* v. *Utah Light & Traction Co.*, 99 Utah 307, 105 P. 2d 347. Of late, and in this case, we have held that an instruction not applicable to any evidence will be presumed to have been ignored by the jury. This means that we will assume that the lay jury exercised more discrimination than the judge. Certainly, I am not one to hold that the mere giving of abstract instructions not applicable to any evidence necessarily constitutes prejudicial error. Trial judges under the pressure put upon them by jury trials give instructions at the time thought to be applicable, which we, in a careful survey of the whole case, may find inapplicable. Unless there is good reason for supposing that the jury might have been misled by such instructions, they should not be held to be prejudicial error even though Sec. 104-24-14 (4), U. C. A. 1943, states that

"the court shall instruct the jury in writing upon the law *applicable to the case* * * *." (Italics added.)

In this case, if the jury construed the ordinance as the majority thinks it may be construed, viz., coincidental with the common law duty of the defendant to guard the plain-

tiff from unreasonable risks when the doors were open, no harm could have been done. If on the other hand, the jury construed the ordinance the way I think its plain language demands that it be construed, it is questionable whether the jury may not have been confused into supposing that some failure to repair was a cause of the injury. But I am willing to assume that as reasonable men they discarded the instruction as meaningless because it is very unlikely that they came to their vertdict on any idea that the accident was due to failure to repair the doors. Later in this opinion I shall use this instruction to compare it with another given in this case which I think erroneous and prejudicial, to illustrate the difference between a case where it is reasonable to think that the jury ignored an inapplicable instruction and a case where it was very likely to have been confused and misled. This brings me to the same result as the main opinion in regard to the ordinance just considered but by an entirely different route.

I concur with the holding that the plaintiff cannot be said in law to be guilty of contributory negligence.

I also concur that there was no error in excluding the evidence of Drs. West and Dumke obtained in the treatment of plaintiff on the ground that such evidence was privileged and that the plaintiff had not waived the privilege. I think there is merit to the suggestion that the policy of the law in protecting a relationship between doctor and patient may have gone too far. But, unlike the Chief Justice, I think this is a matter for remedy by the legislature and not for the judiciary. It should be noted that in respect to doctor and patient, Sec. 104-49-3, subsection (4), does not use the word "communications" but the protection is as to "any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient." This is broader than the word "communication" used in the subsection relating to husband and wife, attorney and client, public officer and the word "confessions" used in reference to a clergyman or priest. But even if the word "communications" were used in this subsection, I think an

X-ray would, according to the cases, be included. See *Yazoo & M. V. R. Co.* v. *Decker*, 150 Miss. 621, 116 So. 287; *Yazoo & M. V. R. Co.* v. *Messina,* 109 Miss. 143, 67 So. 963. It appears quite plainly that an X-ray taken at the request of plaintiff's doctor contains information acquired in attending the plaintiff and necessary to enable the doctor to prescribe for the plaintiff.

Moreover, I fear a rule which would require the trial court to determine what the patient would not have disclosed to the doctor save for the rule, would introduce insurmountable difficulties.

I also concur in the holding that under the pleadings evidence as to impairment of earning power was admissible. I think it was error to instruct the jury that it might consider loss of time (wages) as an element of damages, but not on the grounds assigned by defendant. It argues that loss of wages was wrongly admitted and submitted to the jury *because it was not specially pleaded.* While I think there was no evidence of damage due to loss of time (wages) sufficient to go to the jury, and therefore no evidence of the loss of earning power translatable into dollars, it was not on this ground that defendant objected. If it had objected on that ground I would agree with the Chief Justice that there was no basis to determine loss of earning power after the accident in terms of dollars. For the reason that I conclude that the evidence of loss of time is admissible and submittable to the jury on the pleadings of this case and no contention being made that the testimony introduced would not support a finding on wages or time lost, I concur with the opinion in the result reached in this regard.

The instruction that if the jury found by reason of the absence of any fence or barrier or other protection on the south side of the trap door the sidewalk was not reasonably safe, it could find the defendant guilty of negligence, was prejudicial error. Absence of a fence or barrier on the south side of the door did not contribute to the injury. Hitherto in this opinion for purpose more apparent now, I took occasion to call attention to the fact that we had become more

liberal than formerly in determining whether non-applicable instructions were prejudicial, a policy with which I am in accord. Our inquiry should be as to whether there was good reason to think that a non-applicable instruction was likely to mislead or confuse jurymen—reasonable and conscientious jurymen—as to draw into the vortex of their deliberations an assumption that the subject matter of the instruction was materially involved in the case. And we cannot ascribe to the jurymen in this inquiry the experience and training of astute lawyers or jurists. If the ordinary mind might be likely to conclude that something was a material element in the case because of an instruction whereas it was not, and because of that conclusion there was a good likelihood that the verdict was substantially influenced or affected thereby to the detriment of the appellant, such erroneous instruction should be held as prejudicial. This case presents an example of one erroneous instruction which well may be held not prejudicial. I refer to that instruction in respect to what I consider a non-applicable ordinance hitherto considered. It also presents in the instruction being presently considered an excellent example of one which is prejudicial.

The mind of the jury would be pointedly directed to the fact that the judge considered there was evidence from which it could be concluded that the plaintiff had fallen into the vault because of lack of protection from the south side. The instruction was actually calculated to do that. Yet the accident definitely was caused by the plaintiff not falling into the hole but actually walking against a raised barrier, falling over it—an act in itself strongly indicative of lack of care for his own protection. To divert the mind of the jury from a chain of circumstances which culminated in the accident to a false chain on which could be predicated a conclusion of different and perhaps greater culpability on the part of the defendant when both true and false chains themselves were so closely connected with the same physical object and the manner in which the accident happened may, with great likelihood, have influenced the jury to base a

conclusion on the supposed more culpable delict. The differences between the two situations may at first appear trivial but on reflection they reveal a very marked difference. Certainly the jury may have well come to one conclusion on the belief that the plaintiff's injury came from falling into an unguarded hole and quite a different one on the basis that he fell over a door more than two feet high, which itself would seem to be a fairly good guard against walking into the hole. Of course, if the jury analyzed the evidence as we have, it must have concluded that an instruction which was predicated on a fall from lack of a guard on the south side was not applicable but the distinction between the accident as it happened and one caused in the manner mentioned in the instruction are vital on analysis to the trained mind but seemingly insubstantial to the untrained mind. The jury's mind sees an open unguarded hole, a fall into it by the plaintiff while using the sidewalk. That he fell over the door from the east rather than into the hole from the south may not appear to the jury a distinction of importance. Their minds may too easily, without a wrong instruction to help them, import into the situation a fall into the unprotected hole rather than a blind stumbling over an obstacle and their verdict reached accordingly. Add to that probability an instruction which is predicated on the misstep into the hole rather than a fall over a door and the likelihood that they were influence by it is greatly magnified. I realize that in this case the amount of the verdict seems modest. A new trial might result in a greater sum. The temptation is to have done with the case because, in view of the injuries alleged to be sustained, it is so modest, and therefore to conclude that the jury must not have been influenced by lack of evidence as to wages lost nor by the wrong instruction as to how the accident happened but must have, in view of the amount of the verdict, appraised the plaintiff's damages at such a figure as to give him damages on the lowest level of "pretty good." But the small verdict may have been arrived at by a conclusion that the plaintiff's condition was not so much caused by the accident as from

a previously existing arthritic condition. I might agree that along those lines the jury did quite a good job, but we are dealing with law. It behooves us to steer between the Scylla of our being too lenient and the Charybdis of being too strict with instructions. We may save a verdict at the cost of introducing confusion, uncertainty and error in the law. Because I think this instruction presently under consideration wrong and distinctly prejudicial, I must dissent.

LARSON, Chief Justice (concurring in part, dissenting in part).

I dissent from what is said in the prevailing opinion as to two questions. First, as to submitting the question of loss of earning capacity to the jury, and second as to the exclusion of the offered testimony of Drs. Dumke and West, and third as to instruction with reference to a fence or guard rail on the south side of the trap door. As to all other matters discussed by Mr. Justice Wade, I concur.

As to the question of loss of earning capacity, I do not see how the jury could consider such loss as an element of damage without some evidence as to what the earning capacity was before the accident. A twenty-five per cent or a fifty per cent loss of nothing is nothing. Without some evidence as to what the earning capacity was, the proportions of loss could not be converted into terms of dollars.

With regard to the holding as to the exclusion of the offered testimony of Drs. Dumke and West, I think that Section 104-49-3, U. C. A. 1943, was never intended to be as broad as its application in the instant case, and I find no opinion of this court extending it to that width. I confess that such construction may be inferred from some language in earlier cases, but a question like that now presented was not there involved. The purpose of all the so-called "privilege testimony statutes" is to preserve the confidential relations which should exist between the persons covered by the statute, so each party to such relationship may freely communicate, or otherwise supply to the other, all information necessary or pertinent to enable the parties effec-

tively to achieve the purposes for which the relationship is set up. The statute was not intended to put any party to litigation in an advantageous nor in a disadvantageous position. The statute under conisderation begins:

"There are particular *relations* in which *it is the policy* of the law *to encourage confidence* and preserve it inviolate." (Italics added.)

As such relationships it enumerates husband and wife; attorney and client; clergyman or priest and church member; physician and patient; public officer and informant. But in none of the relationships is the bar all inclusive. It interdicts testimony only as to certain specified types of information. As to the relationship of husband and wife, the bar against testifying is absolute during the marital status except in a proceeding where the parties are adverse. After termination of the marital status, the bar continues only as communications made by one to the other. Except as to communications, there is no bar as to disclosing any fact, after the termination of the relationship. As to attorney and client, the bar goes only to *communications* made by the client, *and advice* given by the attorney. But the lips of the attorney's office help are sealed as to any *fact* of which he acquired knowledge by virtue of his employment. It appears the attorney may testify as to any fact of which he has knowledge not acquired by *communication* from his client. The clergical relation bars only information obtained in confessions (communications) and then only where such confessions are enjoined upon the confessor by course of church practice or discipline. The injunction against the public officer is limited to communications, and then only when the public interest would suffer by the disclosure. After the termination of the confidential relationship the interdiction in the case of these four relationships goes only to *communications* made during the relationship. "Communication" is not limited to oral speech but is limited to information imparted because of the relationship for the purpose of achieving the objects of the relationship.

The prohibition against the physician is "as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient." By the opening paragraph of the section the purpose of this injunction is "to encourage confidence" between the patient and the physician. Bear in mind that the statute does not seal the mouth of the physician against disclosing any information he receives from or about his patient. As far as the statute goes the physician may talk "from Dan to Beersheba" and to every Tom, Dick and Harry on the street. The statute merely seals his lips, against testifying in a *civil action*. So where there is control over the matters that could be narrated, and the physician is limited and confined to such facts as are pertinent and material, relevant and competent in determining the truth with respect to an important issue as to a question of right between two parties, we impose a bar on the physician, but telling him in effect that he can go out on the street and broadcast without limitations the chaff with the wheat. And this anomaly is upon the ground that the law encourages confidences. By subdivision (4) it seems evident this confidence is favored to encourage and permit the patient freely to impart to the doctor any information which is necessary, or will be helpful, to the physician in prescribing or acting for the patient. It is so favored to keep the patient from feeling the necessity of withholding from the physician information which would be helpful in the treatment of the patient. It is so privileged to assure the patient that he need not withhold from his physician information which the patient might feel would be embarrassing or detrimental to his peace of mind, or social or economic standing or repute if it should be publicly known. But the embarrassment, chagrin or ridicule or disgrace guarded against must be such as would result from the fact itself and not from a question as to the patient's veracity. The purpose of the statute is to encourthe confidence that will assure the physician acquiring all necessary information from the patient, and not to enable the patient to conceal all facts in a dispute as to the extent

of his injuries. Only such information as would perhaps not have been disclosed to the physician had the privilege not existed should be considered as privileged, because only such information can be considered as within the policy of the law to encourage confidence.

Bear in mind that the policy of the law as it now stands is not to seal the lips of the physician as to all information he obtains in a professional relationship with his client. This statute was enacted long before statehood. It appears in the Laws of Utah 1888, Section 3878, and has remained unchanged since that time. In 1917 the state enacted a Workman's Compensation Law, and vested the Industrial Commission with the power to determine disputes with regard to injuries received in employment. And before the Industrial Commission there is no privileged communication. The physician may and often does testify freely as to any information he has, even as to what the patient told him. These are public hearings and are made matters of records. The claim of privilege cannot be urged. Under the rule as applied in the majority opinion if A, an employee of B, is injured by a third party C, and A elects to claim compensation from B, A's physician may testify as to any information he has respecting A or his injuries, without limitation because of the privilege statute; but if A elects to sue C for damages, the mouth of the physician is closed under the privilege statute, even though the same question is involved, to wit, the nature, extent and result of A's injuries, and the reasons causing the ultimate result.

As indicated in the beginning of this opinion, the cases heretofore decided in this jurisdiction have lent color to an application of the statute as broadly as is done in the opinion of Mr. Justice Wade. But I think such holdings went beyond the purpose and purport of the statute, were to that extent judicial legislation and should be judicially repealed. Most all the writers on evidence, while recognizing that the majority of the cases lay down the rule as does Mr. Justice Wade, criticize it. 5 Wigmore, Evidence, 2d Ed. (1923) § 2380 et seq.; 1 Greenleaf, Evidence, 16th Ed.

(1899) § 247a; 5 Jones Commentaries on Evidence, 2d Ed. (1926) ; Purrington, An Abused Privilege (1906), 6 Col. L. Rev. 375.

The social policy behind such evidence seems to be greatly overshadowed by the injustices which too often result from suppression of relevant evidence. An article in 13 Wash. L. Rev. 143 points out that any rule which shuts out the truth as this does should only be recognized when considerations of policy very clearly require it. Prof. Wigmore phrases it in 5 Wigmore, Evidence (2d 1923) Sec. 2380, p. 209:

"Certainly it is that the practical employment of the privilege has come to mean little but the suppression of useful truth—truth which ought to have been disclosed and would never have been suppressed for the sake of any inherent repugnancy in the medical facts involved."

For other law review articles discussing this subject, see 33 Ill. L. Rev. 483; 53 Harv. L. Rev. 1204, 1205; 25 Calif. L. Rev. 108; 28 Calif. L. Rev. 391; 20 Calif. L. Rev. 302; 9 Calif. L. Rev. 149; 5 Calif. L. Rev. 446; 13 BULR 846; 13 Miss. L. J. 137.

"As to the policy of the privilege, and of extending it, there can only be condemnation. The chief classes of litigation in which it is invoked are actions on policies of life insurance, where the deceased's misrepresentations as to health are involved; actions for corporal injuries, where the plaintiff's bodily condition is to be ascertained; and testamentary actions, where the testator's mental condition is in issue. In all of these cases the medical testimony is 'the most vital and reliable,' 'the most important and decisive,' and is absolutely needed for purposes of learning the truth. In none of them is there any reason for the party to conceal the facts except to perpetrate a fraud upon the opposing party, and in the first two of these classes the advancement of fraudulent claims is notoriously common. In none of these cases need there be any fear that the absence of the privilege will subjectively hinder people from consulting physicians freely (which is, as we have seen, the true reason for maintaining the privilege for clients of attorneys) ; the injured person would still seek medical aid, the insured person would still submit to a medical examination, the dying testator would still summon physicians to his cure. In litigation about wills, policies, and personal injuries, the privilege, where it

exists, is known in practice to be a serious obstacle to the ascertainment of truth and a useful weapon for those interested in suppressing it. Any extension of it to other jurisdictions is to be earnestly deprecated." 1 Greenleaf on Evidence, 16th Ed., p. 385, 386.

Some courts have held that from the fact that the privilege rule is invoked against the physician testifying as facts material to the trial of the issues, an inference may be drawn that the offered testimony would be adverse. *Killings* v. *Metropolitan Life Ins. Co.*, 187 Miss. 265, 192 So. 577, 131 A. L. R. 684, where an instruction to that effect was held proper. Also see Note 33, Ill. Law Review 483. *Griggs* v. *Saginaw & Flint R. Co.*, 196 Mich. 258, 162 N. W. 960; *Deutschmann* v. *Third Ave. R. Co.*, 87 App. Div. 503, 84 N. Y. S. 887; 17 Harvard Law Review 359; *Porter* v. *Chicago, B. & Q. R. Co.*, 325 Mo. 381, 28 S. W. 2d 1035.

As to the instruction referred to as the third point of difference, I agree with Mr. Justice Wolfe. Because I think the rulings on these three matters were prejudicial error, the judgment should be reversed and a new trial ordered.