693 P.2d 1038

**Steve MORTENSEN, dba Pride Farms Plaintiff-Respondent, Cross-Appellant,**

v.

**CHEVRON CHEMICAL COMPANY, a foreign corporation, Defendant-Appellant, Cross-Respondent.**

**No. 14335.**

Supreme Court of Idaho.

Nov. 23, 1984.

Rehearing Dismissed Jan. 29, 1985.

John T. Hawley, Gary D. Babbitt, and John F. Kurtz, Jr., Hawley, Troxell, Ennis & Hawley, Boise, for defendant-appellant, cross-respondent.

Theodore Wood, St. Clair, Hiller, Wood & McGrath, Chartered, Idaho Falls, for plaintiff-respondent, cross-appellant.

DONALDSON, Chief Justice.

This appeal involves a claim by plaintiff Mortensen against defendant Chevron for damages to Mortensen's 1979 potato crop. The case arose under the following facts: During 1979, Mortensen planted potato seed in five different sprinkler irrigated fields. The potato seed was obtained from three different sources: (1) from Mortensen's own 1978 potato crop, (2) from a Canadian seed grower, and (3) from Ferrell Black Ranches.

Mortensen purchased "Clean-Crop Captan 7.5 Dust Fungicide" (a potato seed protectant) from a retailer, Blair M. Geisler Farm Supply. Mortensen applied the fungicide to all of the potato seed planted except that obtained from Ferrell Black. The fungicide, which comes in a dry dust form that adheres to the cut potato seed pieces, was applied to the seed at planting.

When Mortensen commenced his 1979 planting, the atmospheric temperature was essentially normal. However, as the planting continued, the temperature increased dramatically. Shortly after planting, Mortensen noticed unsatisfactory plant emergence. The acres planted with the untreated Ferrell Black seed showed less decay than the rest of the fields.

Geisler Farm Supply had purchased the fungicide used by Mortensen from the Snake River Chemical Company. Snake River formulated the "Clean-Crop Captan 7.5 Dust Fungicide" which is sold under a Platte Chemical Company label. The fungicide was a mixture of three ingredients—Frianite (diatomaceous earth), Silvacon (fir bark dust), and Captan Concentrate which Snake River purchased from Chevron. Chevron marketed and sold concentrated Captan under the name "Orthocide 80 Concentrate."

Captan is the accepted common name for the organic fungicide N–[ (trichloromethyl) thio]–4–cyclohexene–1, 2–dicarboximide. It was discovered by A.R. Kittleson and his associates of ESSO Laboratories, Chemicals Division, Standard Oil Development

Company of New Jersey. Chevron was granted a license to produce, develop and distribute Captan under the "Orothocide" trademark in the agricultural and industrial fields.

Mortensen originally sued Snake River, Platte, Geisler and Chevron. Mortensen settled with all parties except Chevron prior to trial. Mortensen's claims against Chevron were tried before a jury on the theories of strict liability, negligence and gross negligence and fraud. At trial, Mortensen contended, through his expert witness, that a fungal organism, fusarium, was the primary pathogen which caused his loss. He contended that the fungicide "totally failed to prevent or reduce rot in Plaintiff's potato seed pieces and, to the contrary, directly caused Plaintiff's said potato seed pieces to rot and decay and caused serious and irreversible damage to Plaintiff's 1979 potato crop."

At the close of Mortensen's case in chief, Chevron moved for a directed verdict on all of Mortensen's claims. The district court granted the motion with respect to negligence, gross negligence and fraud, and strict liability based upon failure to warn. Thereafter, the district court submitted the case to the jury on the only remaining theory, strict liability based upon defective design.[1] The jury returned a verdict in favor of Mortensen.

After judgment was entered, Chevron filed alternative motions for judgment notwithstanding the verdict, or a new trial. The district court denied the motion for a judgment notwithstanding the verdict. As to the motion for a new trial, the district court granted a new trial solely and exclusively on the issue of liability. The trial court granted the new trial concluding that the "unreasonably dangerous" element in the prima facie case for strict liability based on defective design must be judged by a "risk/utility" standard, on which the court had not instructed the jury. Chevron appeals from the denial of judgment notwithstanding the verdict. Mortensen cross-appeals from the grant of a new trial.

We first address Chevron's assertion that the district court erred in denying Chevron's motion for judgment notwithstanding the verdict. "A judgment n.o.v. should be granted when there is no substantial competent evidence to support the verdict of the jury." *Brand S. Corporation v. King*, 102 Idaho 731, 732, 639 P.2d 429, 430 (1981); *see Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 518 P.2d 1194 (1974). The only cause of action presented to the jury was strict liability for the alleged defective design of the product Captan. All other claims against Chevron and other parties have either been settled or eliminated by directed verdicts, and Mortensen has not raised on appeal the correctness of those directed verdicts. Therefore, the only issue which we must examine is whether the evidence will support the jury verdict of strict liability for defective design.

Initially we note that there is some confusion as to whether this case is a defective design case at all. At oral argument both parties stated that this is not a defective design case. In support of his effort to reverse the trial court's grant of a new trial, Mortensen's counsel stated:

"There is no allegation in Mortensen's complaint that anybody defectively designed Captan.

. . . .

" '[Captan]' was discovered . . . by a couple of biochemists . . . . It was not designed [by Chevron] from a plant into a synthesized molecule, an organic fungicide.

. . . .

"Now, we again submit that the case is not a design defect case because Chevron didn't design it."

Similarly, counsel for Chevron stated:

"There's just nothing in the record that would indicate that this truly is— that there is a defective design. That's why it's a tough case to analyze because it's not a design defect case."

1. Mortensen never asserted any claim of strict liability based on defective manufacture.

The evidence indicates that Captan was discovered in the Standard Oil Laboratories and that Chevron in no way "designed" the fungicide involved in this case.

Regardless of which of the three general categories of strict liability a case falls under—manufacturing defect, design defect, or failure to warn—there are certain elements which must be met. 2 L. Frumer & M. Friedman, Products Liability § 16A[4] f[i] (1984); W. Prosser, Handbook of the Law of Torts § 99 (4th Ed.1971). Section 402A of the Restatement (Second) of Torts, which was adopted by this Court in *Shields v. Morton Chemical Co.*, 95 Idaho 674, 518 P.2d 857 (1974), states these elements as follows:

"**402A. Special Liability of Seller of Product for Physical Harm to User or Consumer**

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Applying the above elements to this case, we hold that Mortensen has failed to show (1) that the Captan sold by Chevron was in a "defective condition unreasonably dangerous to the user" at the time of sale, and (2) that the Captan was expected to and did reach Mortensen "without substantial

change in the condition in which it was sold."

## DEFECTIVE CONDITION

■ There was no evidence presented at trial of the condition of the Captan sold by Chevron which ultimately reached Mortensen. Mortensen concedes that Chevron did not design the chemical structure of Captan and that the Captan in question conformed to the accepted chemical structure of that product. Proof of malfunction causing direct injury to the potato seed pieces could, under certain circumstances, be circumstantial evidence of the defect in the product at the time of sale. *Farmer v. International Harvester Co.*, 97 Idaho 742, 553 P.2d 1306 (1976). However, the *Farmer* rule that evidence of malfunction is circumstantial evidence of a "defective condition" only applies where the plaintiff's proof has excluded the possibility of other "reasonably likely causes." *Id.* at 749, 553 P.2d at 1313. In the present case, the plaintiff's evidence did not exclude other reasonably likely causes.

■ Plaintiff's evidence consisted primarily of the expert testimony of Dr. Douglas, who testified that in his opinion the product which was applied to Mortensen's potato seed pieces inhibited the suberization[2] process of the potato seed. This opinion was not based upon any experiments or studies conducted by Dr. Douglas on the effects of Captan on suberization, nor was it based upon any other evidence tending to show that Captan harms the suberization process. The basis for Dr. Douglas' opinion was that the right side of one of Mortensen's fields which had not been treated with the 7.5% Captan was not infected to any measurable degree, while the portion using seeds which had been so treated was infected.

Under Farmer, "[a] *prima facie* case may be proved by direct or circumstantial evidence of a malfunction of the product and the absence of evidence of abnormal

---

**2.** "Suberization" is a natural process in which cut potato seeds harden, dry and heal over the cut portion of the potato seed. Suberization tends to naturally inhibit the entry of foreign organisms.

use and the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant." 97 Idaho at 747, 553 P.2d at 1311. In this case, Mortensen did not show "the absence of evidence of reasonable secondary causes." There were several other possible secondary causes. The Captan concentrate furnished by Chevron had been combined with two other inert ingredients by the formulator, Snake River Chemical Company, before selling it to Geisler Farm Supply who sold it to Mortensen. Those other ingredients, or the integrity of the formulator's process were not excluded. Also, the plaintiff's evidence did not exclude the effects of temperature or the specific pathogen which by themselves, or in combination, could have reasonably inhibited the suberization process. We conclude that the plaintiff's testimony did not exclude the possibility of other "reasonably likely causes." The mere evidence that the untreated side of a field was less severely infected than the treated side is not sufficient competent evidence on which a jury could conclude that the Captan concentrate furnished by Chevron to the formulator Snake River Chemical Company was in a defective condition, particularly a defective condition as to design, at the time that Chevron sold the product to the formulator.

## SUBSTANTIAL CHANGE

As was stated above, Mortensen must also show that the Captan was expected to and did reach Mortensen "without substantial change in the condition in which it was sold." Chevron sold the Captan in an 80% concentrated form. The evidence reflects that it was not expected that Mortensen would receive the Captan in that form. Independent formulators substantially changed the product by the addition of fillers which reduced the concentration of Captan to 7.5%. The formulator in this case diluted the Captan with fir bark dust. Although Chevron previously had supplied some formulation instructions to the formulator, Snake River, there was no evidence that Chevron had ever recommended the use of fir bark dust as a filler. Nor

was there any evidence that Chevron had ever marketed or sold any product containing fir bark. There was no competent and substantial evidence presented to the jury that the product sold by Chevron was expected to and did reach Mortensen "without substantial change." The uncontroverted evidence was to the contrary.

Accordingly, the trial court erred in not granting Chevron's motion for judgment n.o.v. In view of our ruling on Chevron's appeal, there will be no new trial, and therefore we need not consider respondent's cross-appeal.

Costs to appellant Chevron.

SHEPARD and BAKES, JJ., concur.

HUNTLEY, Justice, concurring in the result and dissenting in part.

This case comes to us in a rather convoluted posture as the trial court and the attorneys for both parties were imprecise in their legal analysis and failed to recognize the appropriate theory of the case.

In this case Chevron, the manufacturer of Captan, the active ingredient of a fungicide, developed and marketed its product for a specific purpose—for application as a fungicide to potato seed pieces. Chevron knew that the raw chemical would not be applied to the seed pieces but rather that it would be mixed with inert ingredients which would both dilute it and serve as a carrier for spreading it upon the seed pieces.

Chevron, then, was not simply marketing a chemical compound in a vacuum but was marketing it as part of a "system" for use as a fungicide. As the majority notes, "Chevron was granted a license to produce, develop and distribute Captan under the 'Orthocide' trademark in the agricultural and industrial fields". Under such licensing Chevron developed not only the chemical which was the active ingredient but also developed and made recommendations for the method of applying it to the potato seed pieces.

The evidence established that there was nothing defective either with the design or the manufacturer of the product. However, the evidence did establish, and the jury found, that under certain temperature and moisture conditions, the product would not only fail to provide the fungicidal protection, but would cause the seed pieces to decay and rot.

Therefore, the issue should have been whether Chevron negligently failed to warn of such adverse consequences or negligently failed to test the total "system" in varying field conditions of temperature and moisture.

Mortensen's initial pleading included causes of action for failure to warn and for negligence. The trial court granted Chevron's motion for a directed verdict at the close of Mortensen's case on the grounds of negligence, gross negligence, fraud, and strict liability based upon failure to warn. Mortensen did not appeal that ruling and therefore is precluded from achieving relief on this appeal.

The trial court submitted the case to the jury instructing on the theory of defective design. Although this is not a defective design case, the jury may have reached the right result based on the evidence, the instructions notwithstanding.

I disagree with the majority when it attempts to exonerate Chevron by erroneously asserting that it merely produced and marketed a chemical for use in a vacuum. The fact is that Chevron markets its product for use as part of a "system." For years it has followed its products in the field through contracts with agricultural experiment stations and observation of actual farm applications. For the majority to premise its ruling in this case upon the understanding that the manufacture and marketing of only ⅓ of the system is attributable to Chevron is to be blind to what takes place in the real world of developing, testing, marketing, and applying agricultural products.

The majority cites *Farmer v. International Harvester*, 97 Idaho 742, 553 P.2d 1306 (1976) for the proposition that the plaintiff's case failed because it presented only circumstantial evidence of a "defective condition" and that it did not exclude the possibility of other "reasonably likely causes". From that premise the majority concludes that Dr. Douglas' testimony that the product, under the climatic conditions prevailing, inhibited the suberization of the seed pieces was not proof of the cause of the failure of the seed pieces. Certainly that testimony was totally proper and the jury's findings, consistent with that testimony, necessarily ruled out other possible causes. This Court should not overturn a jury's finding of fact which is based upon substantial competent evidence.

While I object to the reasoning of the majority opinion and statement of law expressed therein, I must concur in the result for the reasons previously stated.

BISTLINE, Justice, dissenting from the majority and concurring in part in the opinion of Huntley, J.

Products liability cases are without doubt difficult and complex for the trial judges and attorneys who first deal with them, and no less difficult for appellate courts even though blessed with considerably more time in which to reconsider that which has transpired below. Certainly, as I have remarked in prior opinions, our task, though no less difficult, is not as pressured as the rulings a trial judge has to make on the spot. Yet, even in the spacious amount of time this case has commanded our attention, the five of us have not been able to come to an agreement. The jury reached a verdict in favor of Mortensen. The district judge, however, concluded that the case should be retried because of failure to instruct the jury on a "risk-utility" standard. Whether that ruling was correct or incorrect, we all know that in the time which has gone by a retrial could have been had, and the second trial likely would have been, because of the nature of the beast, more quickly and smoothly tried, and perhaps error-free. And, we all know that under the federal system there exists no right of appeal from the grant of a new trial; hence

the retrial once granted takes place, and ordinarily in short order. If not immediately, it will for certain be over long before the disgruntled party has gone through the time-consuming appellate process in attempting to overthrow the grant of the new trial. It is recognized of course that the appeal here was first taken by Chevron. And it is understandable that Mortensen would naturally cross-appeal. Chevron's appeal appears to be permissible under the rules promulgated by this Court. I.A.R. 11(a)(4). The net result of the two rules is that Chevron can move for a new trial, be awarded a new trial, and, instead of proceeding with the new trial which it has obtained, put the controversy on hold while it appeals from the denial of its motion for judgment n.o.v., thereby depriving the plaintiff Mortensen of his right to immediately proceed with the second trial which Chevron has obtained. Naturally, while thus delayed, Mortensen could be expected to challenge the granting of the new trial, where otherwise he might not have done so in favor of the lesser expense of the second trial while the matter was all fresh in the minds of the witnesses and the court and counsel remained alert to the very complex law which all had been studying. All of which brings me to say that there is something basically wrong with court-promulgated rules which produce such a result. Obviously there should not be an appeal from an order granting a new trial, and equally there should not be an appeal by the party which obtained the new trial from the court's refusal to grant defendant a judgment n.o.v.

Justice Huntley, after due consideration, is convinced that "the jury may have reached the right result based on the evidence, the instructions notwithstanding." I concur in that statement. However, he concludes that because Mortensen did not appeal the ruling under which the trial court granted Chevron's motion for a directed verdict on Mortensen's theories of negligence, gross negligence, fraud, and strict liability—based upon failure to warn—that it is beyond the power of this Court to uphold the verdict. I am unable to agree that we are so fettered, and in particular am guided by the statement of a unanimous Court in *Archer v. Shields Lumber Co.*, 91 Idaho 861, 868–69, 434 P.2d 79, 86–87 (1967):

> This court has frequently held, in effect, that even though certain elements of damages have been erroneously submitted to a jury and erroneous instructions thereon have been given to a jury, such errors will be held non-prejudicial where other evidence is abundant to justify the verdict without taking into consideration the erroneously admitted evidence and the erroneous instructions. *Tarr v. Oregon Short Line R.R. Co.*, 14 Idaho 192, 93 P. 957; *Tucker v. Palmberg*, 28 Idaho 693, 155 P. 981; *Austin v. Brown Bros. Co.*, 30 Idaho 167, 164 P. 95; *Boise Association of Credit Men v. Royal Insurance Company*, 44 Idaho 249, 256 P. 523,; *Nichols v. Sonneman*, [91] Idaho [199], 418 P.2d 562 (1966). This principle is also recognized in other jurisdictions. See *McIvor v. Mercer-Fraser Company*, 76 Cal.App.2d 247, 172 P.2d 758 (1946); *Harding v. H.F. Johnson, Inc.*, 126 Mont. 70, 244 P.2d 111 (1952); *Clawson v. Walgreen Drug Co.*, 108 Utah 577, 162 P.2d 759 (1945).

> . . . .

> Thus, because of the verdict rendered by the jury the errors in instructions and admissibility of evidence claimed by the appellant are deemed non-prejudicial and non-reversible.

I am further highly critical of the Court's rules which require and pertain to the nuisance and expense of filing cross-appeals. Many are the practitioners who have experienced prevailing at trial, notwithstanding errors committed which were prejudicial to their case. He who has prevailed should have no reason to appeal. In fact, in my book, I am unable to see a party who prevails in full as aggrieved, so as to qualify for filing an appeal. But the adverse party does appeal to challenge the judgment which went against him. And, as it turns out, the losing party convinces the Court of prejudicial error adverse to his

cause. With increasing regularity, at oral argument, it appears that the party who prevailed at trial, despite erroneous rulings which perhaps went to keeping out some of his evidence or allowing in his adversaries', and who might continue to prevail except for such error, is asked from the Bench, "Did you file a cross-appeal, counsel?" Recognizing that the Court's rules seem to require respondents to cross-appeal from erroneous rulings which did not prevent them from prevailing below, with all due respect to my rulemaking brethren, I believe the requirement of the rule is in some instances totally absurd—of which this case appears to be a prime example.

Chevron's various motions for directed verdict or judgment n.o.v. were granted in part and denied in part. After a prolonged appellate review, the majority holds as to the motions not granted by the trial court, the trial court erred, and Mortensen was not entitled to any verdict. Justice Huntley, with greater clarity and more persuasion, sees that the jury verdict is nonetheless sustainable on Mortensen's other theories—which were discarded by the trial court on Chevron's motion. Unfortunately, as I read Justice Huntley's opinion, he does not believe that Mortensen's verdict at the hands of the jury can be upheld because the prevailing Mortensen did not appeal those adverse rulings—keeping in mind that those adverse rulings did not hurt him either with the jury's view of his right to recover, or the trial court's view of his right to recover. (Here, again keep in mind that the trial court's grant of a new trial to Chevron was solely because the court thought that in fairness Chevron should have had the benefit of a "risk-utility standard" instruction.)

From time to time I have reminded the other members of the Court of precedent which to my mind is far superior to the Court's rule requiring cross-appeals in these situations. In Rabido v. Furey, 33 Idaho 56, 190 P. 73 (1920), a court which dealt little in promulgating rules but which was long on common sense and logic said this: "Since the appeal was taken from the judgment, and not from a portion thereof, the entire judgment is before the court and subject to review, *even though the respondents took no cross appeal.*" I have always fully agreed with that concept, and recently have become more fortified in my view of the soundness by an article only recently drawn to my attention which was written by Justice Bakes when he was but a few months out of the practice of law and on first becoming aware of appellate procedures. Justice Bakes wrote:

> If one were to draw an analogy with the animal kingdom from an evolutionary point of view, the appellate courts in the United States would have to compare somewhat with the Galapagos Islands. In many respects, both are an evolutionary backwater. While generally the trial courts have evolved a system of rules and practices designed to grant relief where the facts show that a party is entitled to it, the appellate courts still seem to be decided cases upon procedural niceties.
>
> . . . .
>
> ... Rule 54(c) provides that the trial court "*shall* grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." Thus, after a century of trial and error, we have arrived at the point where at least the trial courts are required to grant the relief to which a party is entitled by the facts which he has proved, regardless of how the matter may have been presented in the pleadings.
>
> ... [O]ne need only peruse the decennial digests, Appeal and Error, Key No. 719 *et seq.*, to see the legions of cases and issues disposed of by appellate courts, not on their merits, but upon the failure of the parties or their counsel to comply with some technical procedural nicety. One of the first things which a new appellate judge learns is how to dispose of an issue or a case without actually confronting the issue on the merits....
>
> . . . .

Why, one might ask, have the appellate courts of the United States adhered so tenaciously to such a technical, waiver-oriented type dispositional philosophy which the foregoing quotations exemplify? One reason, of course, is inertia....

... However, even though a new procedure may require greater judicial effort and resources in some cases, the first and foremost goal of any judicial system ought to be that justice is rendered in a given case, and not how efficiently numbers of cases are decided....

... [I]t should be obvious that judicial systems exist to serve litigants, not judges, and the only consideration in any procedural rule ought to be whether or not it is fair to the litigants and promotes substantial justice....

....

... [T]he old common law concept remains nevertheless in that the Court, at its discretion, may disregard an issue which would otherwise be determinative of the case where the brief of the party does not present it for review, if the Court feels so inclined. And, if the interests of justice require that trial courts "shall grant the relief to which a party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings," *it is difficult to see why appellate courts should not also be so required....*

... However, under the present statutes, rules and precedents of the Idaho Supreme Court, many issues are never considered by the supreme court on appeal because of a failure to comply with these technical procedural rules during the course of the trial and the perfection of the appeal.

Bakes, J., *Appellate Procedure—An Evolutionary Backwater*, 10 Idaho L.Rev. 117–124 (1974) (emphasis added).

The article, the tenor of which is clear and requires no comments, fails to make any mention of the only real problem which has perplexed the bar and caused miscarriages of justice—the taking of a cross-appeal. Clearly the philosophy of the article is to follow Rule 54(c), and on any appeal from the judgment, proceed to evaluate the entire situation, and attempt to come up with substantial justice instead of resorting to "technical niceties."

For my part, and the *least* which I would do in this case, fraught with convolution in the district court, and progressing into convulsions in this Court, and with due regard for the difficult nature of the case and its complexities, is to remand to thereupon reinstate the jury verdict and the judgment entered thereon—which is to also suggest that my vote is to not, at this time, embrace the "risk-utility" standard.

If given some additional time for reflection, I would hope that the other members of the Court would join me in changing the rules which allow appeals in situations such as this where the trial court—always closer to the case than anyone but counsel—has seen fit and mete to award a retrial. And more so, the bar would be gratified to see appeals processed with a view toward substantial justice and less obeisance to procedural niceties. To my knowledge, *Rabido, supra,* has never been interred, but is *the* precedent which we should apply in lieu of the cumbersome sandbagging rule of cross-appeals.