HARDING ET AL., RESPONDENTS *v.* H. F. JOHNSON, INC.,
APPELLANTS.
No. 9053.
Submitted November 1, 1951. Decided April 11, 1952.
Rehearing Denied May 29, 1952.
244 Pac. (2d) 111.

Messrs. Wood, Cooke & Moulton, Billings, Mr. James H. Morrow, Jr., Bozeman, for appellant.

Messrs. Meyer & Meyer, Butte, Mr. H. B. Landoe, Mr. Joseph B. Gary, Bozeman, for respondent.

Messrs. Coleman, Jameson & Lamey, of Billings, amicus curiae in support of the petition for rehearing only.

Mr. F. D. Moulton, Mr. Landoe and Mr. William Meyer argued orally.

MR. JUSTICE ANGSTMAN:

This is an action to recover damages caused by a fire. The property involved consisted of a building and its contents used for a garage and residence situated in West Yellowstone, Montana. The building and contents were owned by plaintiffs Hardings on November 27, 1948, at the time of the fire. The plaintiff insurance companies partially insured the building and contents and have each paid the extent of the loss covered

by their policy and have been subrogated to the rights of the Hardings to the extent of their payments. The action was originally brought against the Carter Oil Company and H. F. Johnson, Inc. The jury found in favor of the Carter Oil Company and found in favor of plaintiffs and against H. F. Johnson, Inc. The defendant H. F. Johnson, Inc. moved for a new trial which was denied and it has appealed from the judgment entered against it on the verdict in the sum of $28,000.

Defendant H. F. Johnson, Inc. is a common carrier of petroleum products and on November 27, 1948, was engaged as such in delivering fuel oil and gasoline to the Harding garage at West Yellowstone when the fire occurred. Delivery was made by means of a truck and trailer. On that day defendant H. F. Johnson, Inc. through its driver Calvin Dalley had delivered and unloaded 5,200 gallons of fuel oil and 1,500 gallons of regular gasoline and had nearly completed the delivery of 500 gallons of Ethyl gasoline when the fire started. The petroleum products were delivered in underground tanks situated under the garage part of the building in question. There were intake pipes to these tanks located outside of the building. From each tank there was also a vent pipe which ran from the tank to the outside of the building and up the outside of the wall to permit the escape of fumes. In front of the garage on the south side there was a 14-foot door. The garage floor consisted of cement which extended out beyond the door about 5 feet forming an apron. The floor of the garage sloped to a drain or sump near the north wall in about the center of the garage. Mr. Dalley who delivered the petroleum products testified he was told by defendant Harding when he arrived at the service station on the morning of November 27th where to put the gasoline and oil but this was denied by Harding. In the process of delivering the regular gasoline Mr. Dalley stated that he screwed the delivery hose onto the intake pipe and noticed it was leaking. He said he thereupon took his pipe wrench and gave the coupling a couple of turns and stopped the leakage. The witness Hall on behalf of the plaintiff testified that the leaking gasoline ran

into the garage and that there was about ten gallons of it and when he noticed the leaking gasoline he went out and told Mr. Dalley that, "We're losing a lot of gas, and is there any chance of stopping it". He said he walked through the gas on the floor of the garage and then after speaking to Mr. Dalley about it he went to the post office without cleaning up the gas or doing anything else in connection with it. He said too that he observed gasoline escaping freely between the hose and the intake pipe and nothing was done to stop the flow while he was there. Mr. Dalley testified that what gasoline escaped from the pipe before he tightened the coupling sank into the snow and ice around the fill pipe. It appears that Dalley was never in the garage and hence was in no position to dispute the testimony of Hall that the gasoline flowed into the garage.

The evidence is not clear as to just where the fire started. The plaintiffs take the position that the circumstances indicate that it started on the outside of the garage. Witnesses for the defendant, on the other hand, tesitfied to circumstances which would justify a finding that the fire started on the inside of the garage. The evidence does not indicate just what caused the gasoline to ignite. Evidence offered by plaintiffs was to the effect that the stove in the garage had no fire in it on the morning in question and that there was no machinery in operation. Plaintiffs count strongly upon the circumstance that the defendant in delivering the gasoline allowed the motor of the truck to idle in operating a pump to increase the speed of the flow of gasoline and thereby caused a condition likely to produce static electricity. They also contend that the truck and trailer were not equipped with static chains which touched the ground. Defendant points out that if the chains were not touching the ground that fact was and is immaterial here since the truck and trailer were actually grounded by a sealing chain. It contends also that the fact that Mr. Dalley had stepped on and off the truck a number of times, static accumulations, if any, were thereby grounded.

When the complaint was first filed it contained allegations to the effect that the defendants in disregard of their duty "continued to transfer said gasoline and oil without first cleaning the gasoline and oil from said apron and floor with the result that a spark of fire flew from said truck striking the gasoline and oil on said floor and igniting it and the resulting fire spread and continued to burn until the said building and contents were destroyed as herein alleged. Plaintiffs further allege that what caused said spark to form is to them unknown." At the trial the complaint was amended and the foregoing allegations were eliminated and in lieu thereof plaintiffs alleged that defendant "carelessly and negligently continued to transfer said gasoline and oil without first clearing the accumulated gas and oil from said apron and floor with the result that the defendants negligently caused the gas and oil on said floor to become ignited, resulting in a fire which spread and continued to spread until said building and contents were destroyed as herein alleged. That at the time said gasoline and oil was being delivered as aforesaid, the defendants, their agents and servants, were in the sole and exclusive charge of such delivery and had complete and exclusive supervision, control and management of all operations and work done in connection with such delivery of said gasoline and oil to said Harding's Oval-E Service."

It will be noted that the complaint as amended seeks recovery under the doctrine of *res ipsa loquitur*. Whether or not this doctrine is applicable to the facts in this case is the principal question presented by the appeal. Defendant contends that the doctrine is not applicable because the fire started in the garage and that defendant did not have any control over or access to the garage and had no knowledge as to what caused the fire in the garage. Plaintiffs' view is that the fire started outside the garage but that the doctrine has application no matter where the fire started.

The court held that the doctrine has application and over objection gave its offered instruction No. 1, reading as follows: "You are instructed that from the happening of the fire in-

volved in this case, as established by the evidence, there arises an inference that the proximate cause of the fire was some negligent conduct on the part of the defendants. That inference is a form of evidence, and if there is none other tending to overthrow it, or if the inference preponderates over contrary evidence, it warrants a verdict for the plaintiffs. Therefore, you should weigh any evidence tending to overcome that inference, bearing in mind that it is incumbent upon the defendants to rebut the inference by showing that they did, in fact, exercise ordinary care and diligence or that the fire occurred without being proximately caused by any failure of duty on their part.''

The court was right in applying the doctrine. It is clear from ██ the evidence that the cause of the fire was the gasoline which was allowed to escape. Without it the fire would not have occurred. Just where the spark came from to ignite the gasoline is unimportant. Defendant had the exclusive control of the pipes and hose designed to convey the gasoline into the tank. Gasoline is highly inflammable and gives off fumes which are easily ignited. Those handling gasoline are chargeable with knowledge of its inflammable character and must keep it under control and in confinement.

This case is comparable to that of Lober v. Kansas City, Mo. Sup., 74 S. W. (2d) 815, 819, where the court held the doctrine of *res ipsa loquitur* had application to a situation where the city allowed water to escape into the premises of another. The court in that case, after stating the tests to be applied in determining whether the doctrine of *res ipsa loquitur* applies, said: ''Applying these tests to the situation in this case, it is clearly one for the application of the rule of res ipsa loquitur. When the defendant brought to the solidly built-up and much-used street in question as dangerous an element as water under 75 to 100 pounds pressure, it was up to the city to see to it that such water was under control and confined to the pipes and appliances provided for that purpose. To allow it to escape without control was highly dangerous, and speaks negligence of

those in charge. This hydrant and the water mains with which it was connected was concededly under the sole and exclusive control of the defendant.''

What the court said with reference to oil in General Accident Fire & Life Ins. Corp. v. Hanley Oil Co., 321 Mass. 72, 72 N. E. (2d) 1, 2, 171 A. L. R. 497, applies to the gasoline in question here. The court in that case said: ''Its presence in quantity on the floor was in itself a continuing agency for harm which alone could, and in fact did, operate to achieve damage to the house.''

Defendant relies, among other cases, on that of Starks Food Markets v. El Dorado Refining Co., 156 Kan. 577, 134 Pac. (2d) 1102, 1104. There the question arose on the sufficiency of the complaint to bring the case within the doctrine of *res ipsa loquitur*. There was no allegation that defendant allowed gasoline to escape as here. The complaint merely alleged that while defendant's truck driver was delivering gasoline into a portable tank of the garage tenant the driver of the truck ''negligently and carelessly caused, allowed, suffered and permitted the ignition of gasoline and a fire in and about said tank truck and portable tank.'' The court in holding that the doctrine had no application in that case said: ''However, giving to the allegations of the amended petition a liberal interpretation, it is apparent there is no allegation that the defendants were in charge of or had any control of the portable tank or where it sat inside the garage. The petition is silent about the location of the receiving portable tank, or who determined or controlled it, and about the situation in the garage. We do not know from the petition whether there were gas or electric motors being operated in the garage, whether its doors were open or closed, whether there was any fire to heat the garage, whether it was free from explosive fumes or vapors, or what the situation was except that in making delivery the defendants were in charge of their tank truck and its contents. If on trial the facts alleged were all that were shown, the trier of the fact could only indulge

in conjecture as to the cause of the fire. In such case the doctrine of *res ipsa loquitur* should not be applied.''

We do not regard that case as persuasive here, where it is alleged and proved that defendant allowed and permitted gasoline to escape from the hose and pipes which were in its exclusive control.

The same case under a different complaint came before the court in Bruening v. El Dorado Refining Co., D. C., 53 F. Supp. 356, 357. The complaint there considered, alleged that the truck driver who was making delivery of the gasoline ''carelessly and negligently caused or allowed gasoline to be spilled, or to get out of said appliances onto said wooden floor on the west end of said concrete washrack and of a quantity to be dangerous if, for any reason, it was caused to ignite or if in handling or in removing said nozzle from said portable tank or dropping it, a spark was caused so as to set said gasoline on the floor or on or about said tanks on fire; or if such gasoline, or fumes from it, went down the walls, studding, or supports of said washrack and became ignited by the fire in said furnace; that said gasoline so spilled or so caused or allowed to get out of said appliances onto the floor was of such a quantity that it would be extremely dangerous and cause a hazardous and consuming fire if ignited from any reason or cause, and of such quantity as to run down between the said washrack and floor and down the walls, studding and posts supporting said washrack.''

The court in holding that the doctrine of *res ipsa loquitur* was inapplicable to the facts there pleaded said: ''It can hardly be said that the tanker was in any way involved in the occurrence. It had been used to transport the oil into the garage. While there the operator or driver undertook to siphon gasoline from the tanker into portable tanks. The portable tanks were under the control of the garage owners. It is charged that the operator was negligent in spilling gasoline on the floor in making transfer or delivery through a hose. Nowhere did complainants assert that the instrumentalities used were unsafe or defective. Ac-

cording to the complaints it was the carelessness of the operator or driver that caused the spilling of the gasoline on the floor. It should be stated, moreover, that according to the law the rule of res ipsa loquitur 'cannot be invoked where the existence of negligence is wholly a matter of conjecture and the circumstances are not proved, but must themselves be presumed.' 45 C. J. p. 1211, Section 778.''

Here the circumstance was proved that the gasoline was leaking from the hose connection which was under the control of defendant and there was thus no occasion to indulge in a presumption as to where the leaking gasoline came from and it is not a matter of conjecture whether there was negligence in permitting the escape of the gasoline. Compare Robert R. Walker, Inc., v. Burgdorf, Tex. Sup., 244 S. W. (2d) 506.

The case of Bruchis v. Victory Oil Co., 179 La. 242, 153 So. 828, is relied on, but there the fire started before any gasoline was spilled from defendant's truck. The issue turned upon the question whether there was negligence on the part of defendant in allowing gasoline to escape after the fire started in sufficient quantity to cause the spread of the fire to plaintiff's premises and whether the court could say that such negligence was a contributing factor leading to plaintiff's loss. The court answered this question in the negative.

In a case such as this where defendant allowed gasoline to escape into the garage of plaintiff, we are impressed with the statement of the court in Standard Oil Co. of New York v. R. L. Pitcher Co., 1 Cir., 289 F. 678, 683, as follows: ''It was not necessary that the plaintiffs show that a static spark was actually produced; but it was sufficient if conditions and circumstances were shown from which the inference could be reasonably drawn that a static spark was produced. * * * Circumstances and conditions having been shown which, if the testimony in regard to them were believed by the jury, would furnish ground for a reasonable inference that the gasoline vapor was ignited by an electric spark, generated as claimed by the plaintiffs, it cannot be said that the jury were forced to base their con-

clusions upon inferences drawn from other inferences, instead of proven facts." And see Pure Oil Co. v. Chicago, etc., R. Co., 56 Mont. 266, 185 Pac. 150, where it was held that the origin of fire may be established by inferences drawn from slight circumstantial evidence. Nor is the result affected by the fact that the court instructed the jury: "* * * that the spilling of gasoline in the open air, standing alone, is no evidence of negligence." Spilling of gasoline in the open air is quite different from spilling it at a place where it runs into the premises owned and occupied by another. Nor is it affected by the fact that an instruction was given to the effect that defendant was under no duty to inspect the premises under which the storage tanks were located. Obviously there would be no such duty until and unless defendant spilled gasoline which was likely to flow into the premises under which the tanks were located.

We think too that this case is distinguishable from those where it is known that the act of a third person in lighting a match in a place where the danger was known to exist was held to be the proximate cause of the fire as illustrated by the cases of Globe & Rutgers Fire Insurance Co. v. Standard Oil Co. of Louisiana, 158 La. 763, 104 So. 707; and Staff v. Montana Petroleum Co., 88 Mont. 145, 291 Pac. 1042.

The case of Gerald v. Standard Oil Company of Louisiana, 204 La. 690, 16 So. (2d) 233, has similar features. In that case the three defendants were Traynor, Coca-Cola Bottling Co., Ltd. and Standard Oil Company. Traynor owned the building in which plaintiff lived as a tenant. In part of the building Traynor operated a filling station. While defendant Standard Oil Company was unloading gasoline from a tank truck plaintiff in his sleeping room struck a match causing an explosion and injuries to him and his wife. The defendant Coca-Cola Company was charged with negligence in maintaining advertising signs on the top of the building preventing the diffusion of gas fumes. Traynor was charged with negligence in the manner of the construction of vent pipes and the Standard Oil Company was charged with negligence in delivering an inherently dangerous

and inflammable liquid without inspecting the entire premises. The court of appeals held that a good cause of action was stated against the Standard Oil Company under the doctrine of *res ipsa loquitur* notwithstanding it had no control over the premises where the explosion occurred and ordered the case tried on the merits as to it, and this was affirmed by the supreme court.

In Loos v. Mountain Fuel Supply Co., 99 Utah 496, 108 Pac. (2d) 254, the court held that the doctrine of *res ipsa loquitur* has application to a situation where gas was permitted to escape on premises under the control of the landlord causing injury to a tenant.

The circumstance that the origin of the spark that caused ▮ the fire is not definitely known is not material. Tyreco Refining Co. v. Cook, Tex. Civ. App., 110 S. W. (2d) 219; Welch v. Cooke Chevrolet Co., 314 Ky. 634, 236 S. W. (2d) 690.

"Direct evidence as to the cause of the ignition of gas is not necessary in order to establish the liability of a gas company for damages resulting from an explosion of gas." Note in 25 A. L. R. 293. The same is true of the ignition of the gasoline here.

Contention is made that court's offered instruction No. 1 ▮ was erroneous in that it deprived defendant of the benefit of claiming contributory negligence of plaintiff as the proximate cause of the fire. We do not so construe that instruction. The latter part of the instruction permitted defendant to show its freedom from negligence or that plaintiff's contributory negligence or the negligence of a third person was the proximate cause of the fire. The instruction was taken from California Jury Instructions, Third Rev. Ed., No. 206-B, page 321, and has been approved in cases where the doctrine of *res ipsa loquitur* is applicable. Dieterle v. Yellow Cab Co., 53 Cal. App. (2d) 691, 128 Pac. (2d) 132. Instructions covering contributory negligence were given and the question of contributory negligence was not withdrawn from the jury by the instruction in question. Compare Welch v. Sears Roebuck & Co., 96 Cal. App. (2d) 553, 215 Pac. (2d) 796. The evidence showing as it does

that there was no fire in the stove and no machinery in operation in the garage the question of contributory negligence was one for the jury.

Complaint is made that the court instructed the jury to the effect that plaintiffs are not required to show particularly what the specific act of negligence was which produced the accident, but are only required to show that the accident was one which would not ordinarily occur had reasonable or ordinary care been employed. The law embodied in this instruction has been approved by this court in a case where the doctrine of *res ipsa loquitur* is applicable. Maki v. Murray Hospital, 91 Mont. 251, 7 Pac. (2d) 228.

Defendant predicates error in the giving of instruction No. 16 reading: "You are instructed that when the thing which causes the injury is shown to be under the management of the Defendants, and the accident is such, as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of ordinary care."

This instruction was a statement of the law as announced in the Maki Case, supra.

Defendant contends that the court erred in not giving its offered instruction No. 15 reading: "You are instructed that unless the defendants had superior knowledge of any dangerous condition, if any, which existed immediately prior to and at the time of the fire, your verdict must be for the defendants and against the plaintiffs."

The court did not err in refusing to give this offered instruction. The superior knowledge is imputed to defendant as a matter of law if it had control of the instrumentality causing the damage and there was nothing for the jury to consider in that connection. This does not mean that it should have superior knowledge of where the spark came from that ignited the gasoline. Its negligence follows if it permitted gasoline to escape from its pipes (which were in its control) and come into a

place where it might be ignited. For this same reason the court properly refused defendant's offered instructions No. 8 and 8-A.

Were we to hold that the doctrine of *res ipsa loquitur* is inapplicable we fail to see how defendant has been prejudiced by instructions on the subject. All that the instructions did in substance was to advise the jury that the facts warrant an inference of negligence on the part of defendant. The undisputed facts justified an instruction that the driver of defendant Johnson, Inc. was negligent as a matter of law in permitting such a highly inflammable commodity as gasoline to escape at a place where it was likely to and did run into property of another. Defendant may not complain of an instruction more favorable to it than the facts and law warranted. Compare, Gonzalez v. Nichols, 110 Cal. App. 738, 294 Pac. 758; Gerdes v. Pacific Gas & Elec. Co., 219 Cal. 459, 27 Pac. (2d) 365, 90 A. L. R. 1071; and Edwards v. Gullick, 213 Cal. 86, 1 Pac. (2d) 11.

Defendant complains of the court's action in refusing other instructions offered by it. We have considered those specifications of error but find no reversible error in refusing to give them. Some were covered by other instructions given and others were objectionable as not being a correct statement of the law applicable.

The next assignment of error is predicated upon the giving over defendant's objection of an instruction on damages. The instruction lists 85 items with a statement of the maximum market value of each item. To illustrate: Typewriter—Maximum Market Value $100. It is contended that there was no competent evidence of market value.

Harding testified as to the value of the property, real and personal. The owner of property is a competent witness to estimate its worth. 3 Wigmore on Evidence, 3rd Ed., Sec. 716, p. 48; Klind v. Valley County Bank of Hinsdale, 69 Mont. 386, 222 Pac. 439; Smith v. Armstrong, 118 Mont. 290, 166 Pac. (2d) 793.

The next contention is that there was no evidence that would permit an award for profits from loss of use of the property which was specifically authorized by the instruction. The record does not show that any award was made for loss of anticipated profits. The jury returned a verdict for $28,000. There was evidence supporting an award for that amount and more for the destruction of the building and contents without allowing anything for loss of profits.

We cannot determine from the record that defendant was in anywise prejudiced by the instruction even though the evidence may not have supported an award for profits.

Finding no reversible error in the record, the judgment is affirmed.

MR. JUSTICES METCALF, BOTTOMLY, and FREEBOURN, concur.

MR. CHIEF JUSTICE ADAIR: (dissenting).

The plaintiffs Jack Harding and Erna V. Harding, his wife, owned and operated a service and filling station in the town of West Yellowstone. The building was a cinder block structure 100 feet long by 30 feet wide. The length of the building extended east and west and a north-south cinder block partition divided it in half. The office,—two rest rooms,—an oil storage room and the living quarters of the Hardings were located in the west half of the building.

The east half was a recent addition designed, planned and built by the Hardings as a shop and custom garage and equipped for the repairing, servicing and washing of cars.

Beneath the floor of the shop were located certain gravity tanks buried in the ground and used by the Hardings for the storage of both regular and Ethyl gasoline.

The shop was leased to Stewart Vaughn, a mechanic, but it was also used by the Hardings and their employees who had access thereto and to the tools and equipment therein.

The regular entrance to the shop was by means of an ordinary door in the north wall located at the northwest corner of the

shop. At about the center of the south wall of the shop was a driveway entrance 14 feet wide, for which were provided two large sliding doors suspended from and running upon an overhead track. These sliding doors could only be locked or unlocked from the inside of the shop. With the sliding doors locked the shop could be entered only through the doorway at the northwest corner. The doors to both entrances were kept locked except when the shop was being used by plaintiffs, their employees or lessees. Jack Harding, his employee Lewis Hall, and the mechanic, Stewart Vaughn, each carried a key for the north door to the shop while a fourth key was kept in the office.

The floor of the shop was of concrete and so designed, planned and constructed that it sloped and drained from the sliding doors at the south driveway entrance toward the north wall of the building to a shallow hole or sump at the north wall. Also against the north wall and about 3 feet to the east of the shallow hole or sump was a pot type oil burning heater which was the only means provided for heating the shop.

At the trial the plaintiff Jack Harding testified:

"Q. Where was that sump you have referred to? A. Just to the west of the heater in the center of the building.

"Q. Right close to the heater? A. Oh, it's probably three feet between the two.

"Q. Three feet. In other words, from the sump to the heater, is that right? A. Yes, sir.

"Q. That sump was the place where any liquids that were flowing would flow, like water or anything of that sort, in there when washing a car, flow down that sump, is that correct? A. Yes sir.

"Q. Was there a cess pool or something there? A. Yes, there was a barrel had been buried outside was the reason we had to put the pump in, fill up with grease and wouldn't drain.

"Q. That is where the sump pump came in? A. That's right.

"Q. Was there a screen of some sort over this drain where water went down, or grill? A. No, it was just a shallow—

"Q. Just a shallow hole? A. With a piece of hose.

"Q. Who had the lubrication of cars? You had that, didn't you? A. Yes, sir.

"Q. There in your place? A. Yes.

"Q. Did you do that work yourself or did your employee do it? A. Just depend. Whoever came in when they wanted it. Either of us did it whenever the job occurred.

"Q. That was done on the rack there, is that right? A. Yes, sir.

"Q. What was the purpose of the compressor which is over there in the northwest corner? A. This compressor?

"Q. Yes. A. That operated everything we used, our hoist, and our air for tires.

"Q. And where was your battery charger? A. The battery charger?

"Q. Yes. A. Sitting in the building.

"Q. Whereabouts? A. As I recall, after the fire it was sitting right in the floor, here somewhere. (Indicating.)

"Q. Where was it just before the fire? A. Just before the fire?

"Q. Yes. A. Now, just before the fire it was sitting right there. Earlier that morning I had used it.

"Q. You had used the battery charger that morning? A. Yes, sir."

A mechanic's bench extended clear across the east end of the shop. Also located in the shop were an acetylene welding outfit with oxygen tanks,—vulcanizing tools and equipment,—an electrically operated air compressor,—a sump pump and an air operated car hoist and rack. The shop was provided with various electrical equipment including motors, switches, outlets and drop cords.

At about 9:30 o'clock on the morning of November 27, 1948, Calvin Dalley, a driver employed by the defendant, arrived at the Hardings' filling station with a tank truck and trailer carrying 5,200 gallons of burner fuel oil, 1,500 gallons of regular gasoline and 500 gallons of Ethyl gasoline which had been

ordered by Jack Harding. Harding and his employee Lewis Hall were there when the tanker arrived. The driver left the invoice for his cargo in the office,—asked and was told where to unload and then proceeded to the northeast corner of the shop where he connected his delivery hose with plaintiff's outside intake pipe and made delivery of the fuel oil. This delivery required 80 to 90 minutes. During its progress Jack Harding left the premises and remained away for about two hours, leaving his employee Lewis Hall in control and management of the premises.

Jack Harding testified:

"Q. Was Lewis Hall on the premises when you left? A. Yes.

"Q. Who was Lewis Hall? A. An employee.

"Q. Your employee? A. That's right.

"Q. What was he employed to do? A. Well, he was you might say my assistant. He took charge of the station, or same as I did. Whenever I wasn't there, he was in charge. He was a steady employee.

"Q. When you left there that morning what have you to say as to whether or not there was any work being carried on in the garage? A. There wasn't any except when I went in. There wasn't any work in there then."

The intake pipe for the storage tanks for the regular gasoline was located outside and right at the east edge of the south entrance to the shop, such pipe being but 4 to 6 inches from the outside wall. The intake pipe for the Ethyl gasoline was similarly located right at the west edge of the south entrance to the shop.

Upon completing delivery of the fuel oil Dalley drove his tank truck and trailer to the south side of the building preparatory to making delivery of his load of gasoline. The weather was extremely cold,—the temperature ranging from 18 to 20 degrees below zero,—there was considerable snow on the ground and ice had been allowed to collect around and over the intake pipes. Hall testified:

"Q. * * * How much snow was outside the shop building? A. I couldn't tell you exactly.

"Q. As to depth approximately? A. Oh, there could have been a foot.

"Q. A foot? A. Could have been more or less. * * *

"Q. And did you clean it off on the morning of November 27th? A. I can't recall whether I did or not. I probably had because that was a habit the same as a lot of other things.

"Q. When you shoveled where did you put the snow? A. Had to throw it out in the street.

"Q. Didn't shovel it off to the side of the doors? A. No.

"Q. Carry it on up to the street? A. Don't have to carry it, the street comes right up to the cement.

"Q. Right up to the ramp driveway where the street came? A. Yes, approximately up against it."

After digging out and removing the ice therefrom Dalley took the cap off the intake pipe and by means of a threaded brass coupling attached his delivery hose to the intake pipe leading to the storage tank for the regular gasoline.

When he started to turn in the regular gasoline he noticed a leak around the intake pipe. He testified:

"Q. What happened then, what did you do? A. Got out of the truck, about that time Hall came out. I said, 'It's leaking.' He said, 'I see it is.' I got my pipe wrench, went over and tightened it up about two turns.

"Q. Were you able to tell why it had been leaking? A. Because there was ice on the fillpipe on the threads. I thought I had it tight and it wasn't.

"Q. Were you watching the delivery as it started? A. Yes.

"Q. At what time did you see the leak? A. Right away.

"Q. You then took the wrench and tightened it, is that correct? A. That's correct.

"Q. Two turns? A. Yes.

"Q. Was there any leak after that? A. No. * * *

"Q. Where, if you know, was the gasoline going which leaked at that time? A. Still in the ice around the fillpipe.

"Q. Where you pushed out the ice around the fillpipe? A. Yes.

"Q. After you had tightened that connection, as you already explained to us, was there any further leak while you completed that delivery? A. No, there wasn't."

It required about 30 minutes to complete the delivery of the regular gasoline. Dalley then backed his truck up a few feet, connected his delivery hose onto the intake pipe leading to the storage tank for the Ethyl gasoline and proceeded to make delivery thereof. The completion of the delivery of the Ethyl gasoline took about 15 or 20 minutes. Dalley testified:

"Q. Will you tell us what you did during that delivery? Were you on the ground all the time? A. I was on the tank a couple times.

"Q. What was the purpose of going up on that tank? A. To see how much was left.

"Q. And did you notice anything the last time you were up on the tank? A. Just to see it getting empty.

"Q. What did you do then? A. I got down onto the ground.

"Q. Then what? A. Shut of the valve between truck and trailer.

"Q. Yes? A. Took the transmission out of gear so the pump wouldn't be running.

"Q. Yes? A. And started to take the,—loosen the hose connection from the discharge hose and see it full of gas, the tank was full.

"Q. You could see the tank full of gas? How could you see that? A. Because the hose was full and it wasn't running in. It wasn't running in the tank.

"Q. What did you do then? What happened then, Mr. Dalley? A. Just as I started to unloosen there was *fire broke out inside the building*. The door flew up, pushed me up against the truck.

"Q. Where were you standing at that time? A. With my back to the building facing the truck.

"Q. What did you do then? A. Finished taking the hose off, went around the other side of the truck, took the power takeoff out of gear.

"Q. Will you describe what you saw with reference to the building at the time of the fire, as it broke? A. When I turned around I seen the flames *inside the window,* the window had been blown out.

"Q. And which window do you mean? A. The west window there.

"Q. This window on the south side of the garage, but west of the double doors? A. Yes.

"Q. You could see the fire inside there? A. Just saw a few flames. I didn't see no fire, no.

"Q. What would you say with reference to the outside of the building? A. There was no fire out there.

"Q. Was the door burning on the outside? A. No.

"Q. Now, what did you do after that, Mr. Dalley? A. I got in the truck and drove to the right of the road into a snow bank.

"Q. Then what did you do? A. Got my fire extinguisher and went back to that window.

"Q. What did you do then? A. Tried to put the fire out, but it was gone too far.

"Q. In through the window? A. Yes.

"Q. How close did you stand to that window at that time? A. Right up pretty close. I don't know exactly.

. "Q. Could you tell us how close? A. I imagine a foot from it, two feet."

The plaintiff Erna Harding testified that on the morning in question she was in the bedroom of her apartment which adjoins the shop on the west when she heard an explosion. She testified:

"Q. * * * What drew your attention to the fact there was a fire? A. Well, sort of an explosion.

"Q. What did you hear, or what did you think you heard? A. Oh, just like a whoomph, it rumbled.

"Q. Did it attract your attention? A. Yes, I dashed right out to see.

"Q. Where did you dash? A. I went through the bedroom, through the living room into the office.

"Q. Where did you go? A. I went to that little window, pigeonhole we called it.

"Q. Designated there by 16 and 20 inches? A. Yes.

"Q. What did that consist of? What was the construction of that window? A. Oh, it was just a little window that you could look through to see *in* the garage.

"Q. What did you have to do to look through it? A. Didn't have to do anything.

"Q. Well, I mean did you have, was it open or shut? A. Yes, it was open and I didn't—I mean it was my height so I could see right through.

"Q. You mean you looked through the window? A. That's right.

"Q. You did not place the window open? A. No, it was open. * * *

"Q. You looked through the opening? A. That's right.

"Q. What did you see? A. I saw this fire.

"Q. And where did you observe it? A. Right by that fourteen-foot door.

"Q. Now, here designated on this chart a square inch is delegated the word Reg, regular, with reference to that position where did you see the fire? A. Well, it was right in that corner.

"Q. What corner? A. Oh, the west corner, southwest corner. * * *

"Q. And where did it extend, Mrs. Harding? A. Well, I came back in why it started all over.

"Q. When you first saw it, I am speaking of? A. It was just in this little corner area. (Indicating.) * * *

"Q. And then what did you do? A. I dashed out the front door and called for help.

"Q. And to whom did you call, if you know? A. There wasn't anyone to call to, but I thought someone might hear me."

On her cross examination Mrs. Harding testified that the flame she saw in the shop was 3 or 4 feet from the south wall of the shop and that it was half way from the center of the west wall of the shop.

At the time of the fire there were two cars in the shop, one being over the hoist and the other directly in front of the east window.

Dalley testified:

"Q. Just describe what happened there, Mr. Dalley, in your own language. A. The doors blew out, I don't know how far they came out. I had my back to it.

"Q. How did you know they blew out? A. I turned around and seen them. They come out and fell back * * *

"Q. You didn't know there was a fire at that time? A. I heard it.

"Q. You heard the fire. And you were 12 feet away? A. I imagine.

"Q. There was no explosion? A. Well, as I said before it was a swish like inside the building. There was a noise inside the building. I don't know what you call it.

"Q. Ever heard an explosion? A. Yes, quite a few.

"Q. Was it a noise that resembled an explosion? A. Well, depends upon the kind of explosion.

"Q. Heavy explosion? A. Well, no, not a heavy explosion.

"Q. All right. Medium explosion? A. Well, it resembled that, yes.

"Q. Loud enough so you could hear the noise distinctly and cause you to turn around? A. I felt the heat of it when it blowed the door out."

*Responsibility for Shop.* Jack Harding on his direct examination testified that between 8:30 and 9:00 o'clock on the morning of November 27th he entered the shop or garage to get a piece of equipment and that probably 20 minutes thereafter he returned such equipment. He further testified:

"Q. Was there anybody else in the garage during the time you were there? A. Well, Mr. Hall had come to work by then.

"Q. That was, by then, what do you mean, by 9:30 in the morning? A. Yes, he was there at the time, yes.

"Q. *Whose responsibility was it to care for that garage?* A. *Myself or employee and Mr. Vaughn.*

"Q. *Yourself, your employee and Mr. Vaughn, is that correct?* A. *That's right.*

"Q. *Are charged with the responsibility of taking care of this garage portion, is that right?* A. *That's right.*

"Q. Now, had anything been done there that morning or the night before that might come under the category of taking care of the garage? A. Cleaned, it was cleaned.

"Q. When? A. It was along late in the afternoon, probably 4 or 5 o'clock. Mr. Vaughn worked later that evening and he also cleaned up after he finished.

"Q. What do you mean by cleaned up? A. Well, we had hoses, of course, which they use to hose the floor down."

*Duty to Clean Shop.* Lewis Hall said he left the shop at about 5:00 o'clock on the previous evening, November 26th. He testified:

"Q. Were you in the garage at that time? A. Yes.

"Q. Just prior to leaving? A. Yes.

"Q. What was the condition of the garage as far as cleanliness was concerned? A. Well, it was my job to clean it up. It was clean.

"Q. I still don't think that answers my question. A. It was clean.

"Q. Did you do your job? A. Yes."

Mr. Hall also testified to having had 20 years experience in buying, selling, and delivering gasoline; that he was familiar with the qualities of gasoline and with the rules and regulations governing its handling and that it "is very inflammable."

Hall testified that after the transfer of the regular gasoline from the truck to the storage tanks had started, he (Hall) entered the shop through the small door at the northwest corner; that he walked through the shop and around the two cars and there noticed a quantity of gasoline on the floor spreading

from near the sliding doors to about the central or middle part of the shop. He testified: "Q. Whereabouts on the floor? A. Well, from the large doors going towards the sump and spreading as it spread across the floor.

"Q. Had it gone into the sump? A. I did not notice that."

Hall further testified that he walked through the gasoline to the sliding doors which he opened sufficiently to allow "just space large enough to walk through"; that he stepped outside at which time the driver Dalley was standing on the ground; that he said to the driver, "We're losing a lot of gas, and is there any chance of stopping it?"; that the driver replied that there was no use stopping it as the load was just about emptied; that thereupon he (Hall) stepped back through the doorway; that he closed the double sliding doors behind him and walked back through the gasoline leaving the shop by the door at the northwest corner.

Hall testified:

"Q. Where did you go then? A. I believe I went into the office, or I could have waited on a customer. I mean there was something I did. I can't remember every detail, but it was either to wait on a customer or to go into the office.

"Q. That customer drove up to the front of the building? A. If I waited on a customer why I did or they would.

"Q. You were there and I wasn't. Did you wait on a customer? A. That is what I say. I can't remember just everything that happened during this day. I could have waited on a customer, yes. I don't remember if I went directly into the office. I might have to stop for something. It is kinda hard to remember every action.

"Q. How long do you think you stayed there? A. Oh, possibly five minutes."

When cross examined about the gasoline on the floor plaintiff's employee Hall testified:

"Q. You didn't notice any of the gas going to the sump, is that right? A. I didn't stop to look.

"Q. When you went back in the doorway you closed the door, didn't you? A. Yes.

"Q. What did you do then with reference to that gas? A. Not a thing.

"Q. Just let it lay there? A. Yes.

"Q. Did you attempt in any manner to clean it up? A. No.

"Q. It was right after you left to go to the post office, as I understood you, that the fire must have started? A. It must have while I was down there. It must have started while I was down there. It hadn't started before I left."

The evidence shows that the post office was located about three and a half or four blocks from the filling station. Thus were the plaintiff Jack Harding and his employee Lewis Hall both absent from the premises at the time of the explosion and the starting of the fire which occurred sometime between 12:15 and 12:30 o'clock p. m.

The evidence is undisputed that neither on the day in question nor at any other time did Dalley ever enter the shop. At all times during the transfer of the gasoline Dalley remained outside of the building. His truck and trailer were parked about 12 feet to the south of the entrance to the shop. Dalley testified to having discovered the leak in the coupling connection at the start of the delivery. He said the leakage fell into the ice and snow about the intake pipe located outside of the building. He did not see nor did he know of the presence of the apron outside of the building and extending a distance of five feet to the south of the south entrance and of course he did not know that the building had been so planned and constructed that drainage from such outside apron would flow under the doors and into the shop. While Dalley knew gasoline had leaked from the coupling and into the ice and snow on the outside there is nothing to show that he had been informed or that he had any inkling that any of the gasoline had entered the shop.

While Hall testified that on seeing the leakage which occurred on the outside of the building, he remarked to the driver, "We

are losing a lot of gas and is there any chance of stopping it?" and while Hall said that he observed gasoline on the apron on the outside and to the south of the driveway entrance yet there is no testimony that he ever told Dalley that gasoline was entering the shop and spreading over its floor.

From the time he claims he discovered the raw gasoline spreading on the floor of the shop Hall had ample time to stop its flow and effect its removal. He was in control during Harding's absence. It would have been a simple matter to close the valve to the delivery hose and thus stop all transfer and leakage until the dangerous fugitive liquid on the floor of the shop was captured, controlled and removed. Hall should have immediately informed both Dalley and Mrs. Harding that he had discovered gasoline flowing into the shop and then he and they should have taken prompt action in the emergency to remedy the condition and prevent the fluid from becoming ignited. Because nothing was done and because the gasoline was permitted to be and remain on the floor of the shop a long time after Hall claims to have first discovered its presence there it was subsequently set off and became ignited inside the shop from heat, fire or a spark of undetermined origin so far as the evidence before us is concerned, thereby causing the loss and damage complained of.

*Contributory Negligence.* The defendant H. F. Johnson, Inc., relied upon contributory negligence as an affirmative defense and pleaded that the storage tanks under and about the building owned and exclusively controlled by the plaintiffs Harding were so negligently constructed and maintained by them that gasoline could escape therefrom inside the building wherein plaintiffs kept and maintained various electrical equipment for lighting, servicing automobiles and other purposes and wherein they maintained various petroleum burning heating equipment; that plaintiffs knew, or in the exercise of reasonable care and diligence should have known of the inherent danger in controlling and maintaining the building with such mechanical, electrical and heating equipment and gasoline storage tanks in close proximity one to the other but that notwithstanding such

dangerous and hazardous condition and their knowledge thereof plaintiffs failed and neglected to take any steps to correct said condition or to prevent a fire; that if any gasoline leaked or escaped it was because of plaintiffs' said negligent acts and omissions and that said fire and its resulting damage were proximately contributed to and caused by the said negligent acts and omissions of plaintiffs.

. ''The filling station business is a hazardous one, requiring the utmost care in the handling of oils and high explosives.'' Robert R. Walker, Inc., v. Burgdorf, Tex. Sup. 1951, 244 S. W. (2d) 506, 508. Of this fact plaintiffs' employee Hall with his twenty years experience in the business was fully cognizant. Upon discovering and walking through escaped gasoline that was endangering his employers' property he was not privileged to do nothing other than close the doors behind him, walk out of the plant and remain away therefrom until after the explosion and resulting fire had occurred. For him to so permit the escaped gasoline to be and remain on the floor of the shop was negligence as a matter of law which clearly contributed to and made possible his employers' damage and loss.

Nine witnesses testified on behalf of the plaintiffs. Only one witness, Calvin Dalley, testified on behalf of the defendant. Only the plaintiff Erna Harding and the defendant's driver Calvin Dalley were present on the premises at the start of the fire and they agree that there was first an explosion and then flames and fire on the inside of the shop.

The trial court without objection gave its instruction No. 22 as follows: ''You are instructed that the spilling of gasoline in the open air standing alone, is no evidence of negligence.''

Such is the law. As was said by the court in Globe & Rutgers Fire Ins. Co. v. Standard Oil Co., 158 La. 763, 104 So. 707, 708: ''We see no evidence of any negligence on the part of defendant's agent; for we recognize that large volumes of liquids (300 gallons here) cannot be handled without spilling small quantities thereof at times. And to convict a vendor of gasoline of negligence under such circumstances would amount to making him

an insurer towards all against the dangerous properties of that fluid.

"We do not mean to say that a handler of gasoline is not required to handle it with some care, and need not take precautions against spilling it around. Indeed, his own safety requires him to do so; but spilling small quantities thereof is unavoidable, and gasoline is an article of prime necessity today; so that the public is bound to share some small part of the risk of handling it, to wit, that part of the risk which is unavoidable."

Dalley admits that because of the presence of ice on the threads of the coupling there was a leakage when he first turned the regular gasoline into the intake pipe, but testified that he immediately noticed it and stopped it with the loss of but about a gallon or a gallon and a half which leaked into the snow and ice around the intake pipe, all on the outside of the building.

Dalley testified that he did not observe any concrete apron on the outside of the building extending some five feet south from the sliding doors and that when he was making his delivery such portion of the premises was covered with snow and ice. On cross-examination he testified:

"Q. Was there much ice around there? A. A lot of ice.

"Q. Did it cover the pipe? A. Yes.

"Q. Cover the top of the pipe? A. Covered the cap, yes.
* * *

"Q. You moved that snow and ice, didn't you? A. Yes.

"Q. You could see then, couldn't you? A. Yes.

"Q. As a matter of fact, it was situated above the level of the ground there, wasn't it? A. I said the ground was covered with snow. There was snow all around there. I don't know where the ground was.

"Q. Was the ramp or apron, were you in that vicinity at that time? A. If there was one I never seen it was there.

"Q. That was also covered with snow and ice? A. That's right.

"Q. So anybody driving a truck or car into the garage would have to drive over this snow and ice? A. As far as I know, yes."

The trial court also gave without objections its instruction No. 26 as follows: ''In making the delivery of gasoline there 'was no duty upon the defendant H. F. Johnson, Inc., or its employee Calvin Dalley to inspect the premises under which the storage tank was located; therefore, if you find that Calvin Dalley did not inspect the inside of the shop before or while making the delivery, that fact is no evidence of negligence on the part of the defendant H. F. Johnson, Inc.''

Dalley had neither access to the shop nor had he any duty to inspect its interior. As was said in Bruchis v. Victory Oil Co., 179 La. 242, 153 So. 828, 832, ''Here the defendant did not own or control the premises where the fire originated, but owned and controlled only the truck and its parts.''

The above quoted instructions so given without objection became the law of the case. See Ashley v. Safeway Stores, Inc., 100 Mont. 312, 328, 47 Pac. (2d) 53; Cacic v. Slovenska Narodna etc., 102 Mont. 438, 446, 59 Pac. (2d) 910; Chancellor v. Hines Motor Supply Co., 104 Mont. 603, 614, 69 Pac. (2d) 764; Baron v. Botsford, 108 Mont. 356, 361, 90 Pac. (2d) 510.

Over defendant's objections the trial court proposed and gave the jury two instructions on the doctrine of *res ipsa loquitur* being the court's instructions Nos. 1 and 2. In my opinion the doctrine of *res ipsa loquitur* has no application whatever to the instant case. The doctrine of *res ipsa loquitur* does not apply where as here, the instrumentality causing the damage or injury is not under the exclusive control and management of the defendant or where more than one inference can be drawn from the evidence as to the proximate cause of the damage or injury or where the proof of the occurrence, without more, leaves the matter resting only in conjecture. My views respecting the doctrine invoked are set forth in my dissenting opinion in the recent case of Whitney v. Northwest Greyhound Lines, Inc., 125 Mont. 528, 242 Pac. (2d) 257.

The phrase *res ipsa loquitur* does not mean that proof of the accident alone warrants recovery in cases in which the doctrine is applicable. Johnson v. Herring, 89 Mont. 420, 425, 426, 300

Pac. 535. In a proper case the doctrine permits the jury, *but not the court* in a jury trial, to draw an inference of negligence. It merely permits but it does not compel the drawing of such inference. It does not shift the burden of proof. When all the evidence is in, it is still for the jury to determine whether the preponderance is with the plaintiff. Compare Sweeney v. Erving, 228 U. S. 233, 33 S. Ct. 416, 57 L. Ed. 815, Ann. Cas. 1914D, 905.

In 38 Am. Jur., Negligence, it is said: "It is essential to the application of the doctrine of res ipsa loquitur that it appear that the instrumentality which produced the injury complained of was at the time of the injury under the management or control of the defendant or of his agents and servants. * * * The doctrine does not apply where the agency causing the accident was not under the sole and exclusive control of the person sought to be charged with the injury. If it appears that two or more instrumentalities, only one of which was under defendant's control, contributed to or may have contributed to the injury, the doctrine cannot be invoked. Likewise, where the acts or omissions of two or more independent persons are apparently equally immediately responsible causes of the injury, the doctrine has no application." Sec. 300, pp. 996, 997. "Nor does it apply where an unexplained accident may be attributable to one of several causes, for some of which the defendant is not responsible. It should not be allowed to apply where, on proof of the occurrence, without more, the matter still rests on conjecture alone or the accident is just as reasonably attributable to other causes as to negligence." Sec. 303, p. 1000.

In 65 C. J. S., Negligence, sec. 220(8), pp. 1011-1014, it is said: "The doctrine is to be applied only when the nature of the accident itself not only supports the inference of defendant's negligence, but excludes the idea that the accident was due to a cause with which defendant was unconnected. * * * The injury must not have been due to any voluntary action or contribution on the part of plaintiff or, as some courts put it, the injury must have happened irrespective of any such action or con-

tribution on his part; and the doctrine is inapplicable if it appears from the evidence that the accident might reasonably have been caused by plaintiff's own negligence.''

The doctrine does not apply where more than one inference can be drawn from the evidence as to the proximate cause of the injury or loss. ''A verdict cannot rest upon conjecture, however shrewd, nor upon suspicion, however well grounded.'' Fisher v. Butte Electric Ry. Co., 72 Mont. 594, 602, 235 Pac. 330, 332.

As was said in Reese v. Smith, 9 Cal. (2d) 324, 328, 70 Pac. (2d) 933, 935, ''If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary. * * * A judgment cannot be based on guesses or conjectures.'' Also see Jacobs v. Bozzani Motors, Cal. App., 241 Pac. (2d) 642, 647.

In my opinion the court's instructions Nos. 1 and 2 on the doctrine of *res ipsa loquitur* are erroneous and the giving thereof was highly prejudicial. By these instructions the burden of proving freedom from negligence and of establishing the proximate cause of the fire was improperly placed on the defendant; the jury was incorrectly told that as a matter of law the fire itself, starting as it did in plaintiffs' shop to which defendant had no access, warrants an inference of negligence on the part of the defendant and that irrespective of the contributory negligence of plaintiffs, nevertheless the burden was on the defendant to show the cause of the fire. The instructions incorrectly authorized a verdict based upon mere suspicion, surmise and conjecture instead of requiring that it be based upon a preponderance of competent evidence showing the proximate cause of the fire and resulting loss. The judgment should be reversed because of the giving of the court's first two instructions and because the evidence shows that, as a matter of law, plaintiffs' employee Hall while in complete control and management of the plant was guilty of contributory negligence.